Argued and submitted October 9, 1981, affirmed June 9,
reconsideration denied September 2,
petition for review denied October 26, 1982 (293 Or 801)

CARLSON et al,
*Appellant,*
*v.*
PIPER AIRCRAFT CORPORATION et al,
*Respondents.*

(No. 418-692, CA 17263)

646 P2d 43

Randall L. Dunn, Portland, argued the cause for appellant. With him on the briefs were Martin Schedler, Robert B. Hopkins and Keane, Harper, Pearlman and Copeland, Portland.

William B. Crow, Portland, argued the cause for respondent Piper Aircraft Corporation. With him on the brief were Grant T. Anderson, James N. Westwood and Miller, Nash, Yerke, Wiener & Hager, Portland.

John R. Barker, Portland, argued the cause for respondent Pacific Northwest Aviation, Inc., dba Hillsboro Aviation Company. On the brief were Margaret H. Leek Leiberan and Lang, Klein, Wolf, Smith, Griffith & Hallmark, Portland.

Before Gillette, Presiding Judge, and Joseph, Chief Judge,* and Young, Judge.

YOUNG, J.

---

* Joseph, C. J., *vice* Roberts, J.

## YOUNG, J.

This is a wrongful death action arising out of the mid-air breakup of a single engine airplane during a flight from Martha Lake, Washington, toward Portland during the afternoon of October 13, 1973. Plaintiff is the personal representative of the estate of her husband, James, who was the pilot and sole occupant of the airplane. Plaintiff's seventh amended complaint alleged a cause of action for strict product liability against defendant Piper Aircraft Corporation for design defects and a negligence cause of action against Pacific Northwest Aviation, Inc., dba Hillsboro Aviation Company, for negligence in repair. Defendants contend that the accident was the result of the pilot experiencing spatial disorientation that caused him to overstress the airplane during flight. The jury returned a verdict in favor of both defendants, and plaintiff appeals. We affirm.

Plaintiff first assigns error to the reinstruction of the jury. She contends that the submission of copies of written instructions to the jury during its deliberations constituted error, because the submitted instructions did not include instructions on defendants' standard of care. Plaintiff objected to the failure to so instruct by moving for a new trial after judgment. Plaintiff had submitted proposed written instructions on defendants' standards of care. The trial judge rejected those instructions in his original charge to the jury. Instead, the judge summarized in his own words the law on the standard of care. Plaintiff does not assign error to any of the original instructions given or to the original failure to give the requested instructions.

Following an intervening weekend and one day of deliberation, the jury requested copies of the trial court's instructions. The judge told the jury that he could provide them with copies of the written instructions concerning the issues of negligence and strict liability. Counsel approved the submission of the written instructions to the jury, and the judge submitted them.[1]

---

[1] The colloquy between the court and counsel was:

"THE COURT: What do you think about submitting the written instructions?

Plaintiff argues that the court should have included with the submitted instructions her requested written instructions on the standard of care which the trial judge had earlier rejected. She knew at the time the written instructions were submitted in response to the jury's request that her requested instructions had been rejected.[2] However, she did not request that her rejected instructions be submitted. Plaintiff knew that the trial judge, by paraphrasing, had earlier instructed on the standards of care and that those paraphrased instructions were not in writing. In short, plaintiff agreed to "whatever fashion" the trial court chose to submit the written instructions. Plaintiff had the opportunity to examine the written instructions prior to their submission but did not. It was her responsibility to call the trial court's attention to deficiencies, if any existed, in the instructions submitted.

----

"[Plaintiff's counsel:] As far as Plaintiff is concerned, I don't see how it could hurt at all. I think it would help the jury in deliberations. And I think any information along that line they can get would be helpful. We'd be agreeable.

"[Counsel for Piper Aircraft:] What kind of shape are they in, Judge?

"THE COURT: Most of them are pretty good. I think I can probably dig up a clean set of the ones that you've submitted collectively and submit those without my scribbling on it.

"[Counsel for Piper Aircraft:] The problem I see is we have 'Defendant's Requested Instructions,' and if that could be obliterated with my name on it — with my name obliterated too.

"[Counsel for Hillsboro Aviation:] I wouldn't object on that basis.

"THE COURT: What I propose sending them is none of the instructions except the ones that relate to the liability questions, negligence and strict products liability.

"[Counsel for Piper Aircraft:] And contributory.

"THE COURT: And contributory.

"THE COURT: I could take a pair of scissors and snip out the names.

"[Counsel for Piper Aircraft:] I'm willing to go along with that.

"[Counsel for Hillsboro Aviation:] I am too.

"[Plaintiff's counsel:] I would be agreeable with whatever fashion the court wants to put them in there. I think we can take care of all the contingencies.

"THE COURT: Well, I don't see any reason for you guys to wait."

[2] Plaintiff took exception to the court's failure to give her requested instructions when the trial court initially instructed the jury.

ORCP 59D regulates further instructions to the jury and provides, in pertinent part:

"* * * [U]pon the jury being brought into court, the information requested, if given, shall be given either orally or in writing in the presence of, or after notice to, the parties or their counsel."

One of the functions of the rule is to provide a party an opportunity to make a record of the rulings made by the trial court. *See Huntley v. Reed,* 276 Or 591, 594, 556 P2d 122 (1976); *Oien v. Bourassa,* 221 Or 359, 370, 351 P2d 703 (1960). The posture of the present case is that there is no record to review to determine what instructions were or were not submitted because those written instructions are not part of the record before us.

■    Plaintiff next contends that the court erred in overruling her relevancy objections to testimony of four witnesses to the effect that a non-instrument-rated pilot flying in clouds or without visual reference can become spatially disoriented and lose control of the aircraft. Plaintiff argues that the testimony concerning spatial disorientation is analogous to prior acts of negligence and is therefore too remote from the issue of the pilot's actual conduct. In addition, plaintiff argues that, if the evidence is relevant, there was no foundation to demonstrate that previous incidents of spatial disorientation occurred under similiar circumstances.

The decedent was a VFR[3] pilot with limited flying experience. Although he had received a few hours of instrument instruction, he was not licensed to fly by reference solely to instruments. The evidence was that a pilot without visual references, such as would occur when flying in clouds, may become confused and disoriented because of a loss of the visual horizon. Testimony indicated that disorientation can occur in less than 40 seconds. The sensations experienced are so intense that an inexperienced pilot

---

[3] VFR refers to the "Visual Flight Rules" set forth in 14 CFR § 91.105, which apply to the operation of aircraft by non-instrument-rated pilots. IFR refers to "Instrument Flight Rules," which is flight by use of the aircraft's navigational instruments rather than by visual reference. 14 CFR § 61.3(e) provides that only instrument-rated pilots are entitled to fly under instrument flight rules or in weather conditions less than the minimums prescribed for VFR flight.

will disregard his instruments, believing them to be inaccurate. In short, the pilot does not know "which way is up" and may adjust the aircraft abruptly, with possibly disastrous consequences.

Given this explanation of spatial disorientation, we do not agree with plaintiff's characterization that it is evidence of other acts of negligence. Even if we were to accept that premise, our analysis is the same. The issue is the *relevancy* of evidence of spatial disorientation.

■ ■ Relevant evidence is that which in some degree advances the inquiry, is probative and is therefore prima facie admissible. McCormick, Evidence 439-40, § 185 (2d ed 1972). When a relevancy objection is made, the trial court must assess the probative value of the proferred evidence and weigh it against the danger of prejudice, surprise and confusion. In *Carter v. Moberly,* 263 Or 193, 501 P2d 1276 (1972), the court stated the rule:

"If [the trial judge] finds the evidence to have no probative value, he must exclude it. If, on the other hand, it does tend to establish a fact in issue, and no contrary considerations are present in the particular case, the evidence must be admitted. Between these two extremes, however, is an area in which further judgment must be exercised. If the evidence has some probative value, but also presents difficulties such as [undue prejudice, consumption of undue time, or unfair suprise,] the judge must determine whether the value of the evidence outweighs, or is outweighed by, the offsetting considerations. We sometimes call the exercise of this kind of judgment 'discretion.' Its exercise requires the judge to weigh the value of the evidence in light of all the circumstances of the particular case, and his conclusion, if it is reasonable, will not be disturbed on appeal. Precedent is of little value in reviewing such cases, because even when cases involve similar issues and similar types of evidence, the other factors which may properly influence the trial court's ruling are highly variable. We simply determine whether, on the facts of the particular case, the trial court's ruling was within the reasonable or permissible range. We need not determine whether his ruling was the only one possible. It may be that the record will support either admission or exclusion; if so, the trial court's ruling will be affirmed, regardless of which solution we would prefer." (Footnote omitted.) 263 Or at 200-01.

The question is whether the phenomenon of spatial disorientation is sufficiently probative on the issue of causation to be relevant and admissible. Plaintiff presented evidence that the break-up was the result of a design defect and inadequate and improper repair, which resulted in a high frequency oscillation of the airplane components called "flutter." There was also evidence that overstress of the flight surfaces was the cause of the breakup. There was evidence that the decedent may have been flying in clouds and turbulent weather at the time of the accident. The conclusion sought by defendants was that the pilot had lost his visual reference in the clouds, became disoriented and overstressed the aircraft, which caused the mid-air breakup. Evidence relating to spatial disorientation tended to establish defendants' theory of causation and was relevant. *Carter v. Moberly, supra; Byrd v. Lord Brothers,* 256 Or 421, 473 P2d 1018 (1970).

■ The process of balancing the evidence's probative value against prejudice, possible confusion or time consumption may be reviewed only for an abuse of discretion. *Carter v. Mobely, supra; Byrd v. Lord Brothers, supra; Trook v. Sagert,* 171 Or 680, 138 P2d 900 (1943). Furthermore, the latitude granted the trial judge in making that decision is broad in complex cases. *Carter v. Moberly, supra,* 263 Or at 202. The complexity of this case is evident: The trial lasted two weeks, producing 43 witnesses, 60 exhibits, and over 2,100 pages of testimony. Aircraft design and operation are beyond the knowledge of most laypersons. The trial judge found the phenomenon of spatial disorientation to be a "fact of life"[4] that could shed some light on the cause of the accident. He decided that the probative value of the evidence outweighed other considerations. The trial judge was within his discretion in admitting the evidence.[5]

---

[4] While no Oregon case has addressed the admissibility of evidence concerning spatial disorientation, the following cases have accepted such evidence and treated the matter as a universal phenomenon: *United States v. Murray,* 463 F2d 208 (10th Cir 1972); *Croce v. Bromley Corp.,* 623 F2d 1084 (5th Cir 1980), *cert den* 450 US 981; *Pierce v. United States,* 16 Aviation Cases 17,405 (MD Tenn 1980); *Lindsay v. McDonnell Douglas Aircraft Corp.,* 352 F Supp 633 (ED Mo 1972), 460 F2d 631 (8th Cir 1972); *Himmler v. United States,* 474 F Supp 914 (WD Pa 1979).

[5] The appellant also objects to the testimony of spatial disorientation as cumulative. We find no merit in that argument. Appellant also contends that the

■ ■ Plaintiff next assigns as error the trial court's failure to sustain objections to the qualification of a witness to testify concerning the loads and stresses on aircraft. Again, that is a matter within the trial court's discretion, reviewable only for abuse. *Yundt v. D & D Bowl, Inc.,* 259 Or 247, 486 P2d 553 (1971); *Kimball v. Little River Lumber,* 44 Or App 497, 606 P2d 660, *rev den* 289 Or 155 (1980). The witness had been a pilot since before 1940 and had logged 26,000 hours of flight time. He had witnessed first hand the result of human input on aircraft during his years of flying. The witness was asked what effect pilot over-control of an aircraft has on the loads exerted on its structure. He did not testify about the structural sufficiency of the particular aircraft but rather only about the effects of pilot overcontrol. The court found that the witness was qualified to testify. We agree. *See City of Portland v. Nudelman,* 45 Or App 425, 608 P2d 1190, *rev den* 289 Or 275 (1980).

■ Plaintiff's last claim is that the trial court erred in excluding a portion of the deposition testimony of Mr. Powers, an aircraft accident investigator for the National Transportation Safety Board (NTSB).[6] The testimony was:

"[Question:] My question was simply whether you found any evidence from your investigation indicative of pilot error or misoperation of the aircraft which contributed to the cause of the crash?

"[Mr. Powers:] There was none noted.

"[Question:] You don't recall any, is that correct?

"[Mr. Powers:] Right."

The testimony was excluded during plaintiff's case-in-chief on the ground that Powers was not shown to be qualified to express an expert opinion. After defendants rested and during rebuttal, plaintiff made an offer of proof that Powers was qualified to give an expert opinion and reoffered the testimony. The trial court denied the offer and excluded

_____

experts who testified on spatial disorientation based their opinions on hearsay. Plaintiff did not raise that ground below, and we therefore decline to address it on appeal.

[6] The NTSB was established in 1966, 49 USC § 1654, as an independent agency within the Department of Transportation. Its duties include aircraft accident investigation. *See* 49 USC 1901 *et seq.*

the testimony because it was not probative of any material fact. The exchange between the court and plaintiff's counsel is set out in the margin.[7]

Defendants objected to the testimony on the additional ground that a NTSB investigator is prohibited by federal law from giving his expert opinion on the cause of the crash.[8] Defendants rely upon 49 USC, § 1903(c), which provides:

"No part of any report of the Board, relating to any accident or the investigation thereof shall be admitted as evidence or used in any suit or action for damages growing out of any matter mentioned in such report or reports."[9]

The statute and 49 CFR § 835.3, *supra* n 8, have been interpreted by federal and state courts, which have held that federal investigators may relate factual evidence and give opinions so long as they do not testify to their own or to NTSB's "ultimate conclusion" concerning the cause of

---

[7]

"[Plaintiff's counsel:] Your Honor, the question was not what is his opinion as to the cause of the crash. The question was simply did he find any evidence indicative of pilot error, and that was the question.

"The Court: What's it mean?

"[Plaintiff's counsel:] Did he find any evidence in his investigation which would indicate pilot error?

"The Court: Well, does it mean there was or wasn't any evidence? It just means he didn't find it.

"[Plaintiff's counsel:] It means he didn't find any as an accident investigator. That's correct.

"The Court: I don't really think that's helpful. That's the reason I don't think it should be in the case."

[8] Powers had prefaced his deposition testimony by referring to 49 CFR § 835.3, effective July 17, 1975. It provides:

"Consistent with paragraph [a] of this section, [NTSB] employes may testify as to the factual information they obtain during the course of the accident investigation, including factual evaluations embodied in their factual accident reports. However, they shall decline to testify regarding matters beyond the scope of their investigation *or to give opinion testimony concerning the cause of the accident.*" (Emphasis added.)

The authority for the regulation is the Independent Safety Board Act of 1974, 49 USC § 1901 *et seq.* and Title VII, Federal Aviation Act of 1958 as amended. 49 USC § 1441.

[9] An identical provision is found in 49 USC § 1441(e) of the Federal Aviation Act.

the accident or the negligence of the tortfeasor.[10] *American Airlines, Inc. v. United States*, 418 F2d 180, 196 (5th Cir 1969); *Kline v. Martin*, 345 F Supp 31 (ED Va 1972); *Todd v. Weikle*, 36 Md App 663, 376 A 2d 104 (1977).[11] In *Beech Aircraft Corp. v. Harvey*, (Alaska) 558 P2d 879 (1976), the question was whether the aircraft crashed because of structural fatigue or an overload. The expert opinion of a NTSB investigator was excluded because it went to the "ultimate issue" in the case. The excluded testimony was:

---

[10] It appears that the statute excluding NTSB reports and the regulation limiting investigator testimony are considered necessary for the NTSB to function independently in its investigations and consequently to be more effective in preventing future accidents. One writer explains:

"The conclusions in the report are directed solely towards air safety and government regulation. Problems of legal liability are not considered, and conclusions concerning it are avoided. The [Board] is free to speculate, and it sometimes bases its conclusions on conjecture. Unsolved *accidents are disquiet-ing* and not conducive to public confidence in the reliability of air transport. Therefore, in the author's opinion, the Board feels a strong pressure from the public, the industry, and the executive and legislative branches of the Federal Government to reach a finding of probable cause." Speiser, *Airline Passenger Death Cases*, § 49, p 241 (1965).

In *Berguido v. Eastern Airlines, Inc.*, 317 F2d 628 631 (3rd Cir 1963), the court stated:

"The fundamental policy underlying [the statute] appears to be a compromise between the interest of those who would adopt a privilege in order to secure full and frank disclosure as to the probable cause and thus help to prevent future accidents, and the countervailing policy of making all accident information available to litigants in a civil suit."

In *Lobel v. American Airlines*, 192 F2d 217 (2d Cir 1951), *cert den* 342 US 945 (1952), the court found that the statutory provision

"was designed to guard against the introduction of [Board] reports expressing agency views about matters which are within the functions of court and jury to decide." 192 F2d at 220.

*Legislative history suggests that the congressional purpose in excluding NTSB reports is to protect the integrity of the Board's accident investigation function by preventing involvement in liability litigation.* Civil Aeronautics Board, Legislative Program, 86th Cong 2d Session, Item 5, p 14. *See* 1 Kreindler, Aviation Accident Law § 18.01(2) p. 601 (1963).

[11] Plaintiff does not argue that the federal statute and regulation do not apply in this action, nor has she cited any contrary authority. In *Myers v. Cessna Aircraft*, 275 Or 501, 517, 553 P2d 355 (1976), the court affirmed the exclusion of an aircraft accident investigation made by Canadian officials on hearsay grounds but noted by way of dictum that such official reports were not admissible in Canadian courts and that

"by statute similar material in reports prepared by American officials is also not admissible. *See, e.g., American Airlines, Inc. v. United States*, 418 F2d 180 (5th Cir 1969); *Berguido v. Eastern Airlines, Inc.*, 317 F2d 628 (3rd Cir 1963); *Israel v. United States*, 247 F2d 426 (2d Cir 1957)."

"Would you tell me as best you recall what the bottom fittings on the Kodiak accident case that you examined looked like?

"Well, they looked like overload."

In *Murphy v. Colorado Aviation, Inc.,* 41 Colo App 237, 588 P2d 877 (1978), the NTSB investigator was permitted to testify to factual data, weather conditions, and the difference between visual (VFR) and instrument flight ratings (IFR). He said that only an IFR pilot should fly in clouds and that in view of prevailing weather conditions, only an IFR pilot could have been flying properly at the altitude at which the crash occurred. The court held the investigator's opinion admissible because he did not state that the accident was caused by pilot negligence.

On the basis of the limited record here, our conclusion is that the question called for and elicited an opinion on the cause of the crash which the regulation forbade the witness to give. *See Beech Aircraft Corp. v. Harvey, supra.* On the basis of the authority cited, we conclude that the testimony was property excluded.[12]

Affirmed.

---

[12] When it appears from the record that the trial court arrived at a correct result but on grounds different from those that which, in our opinion, are more correct, the judgment of the trial court will be affirmed. *Huff v. Bretz,* 285 Or 507, 519, 592 P2d 204 (1979).