**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**Laurence John LAYTON,
Defendant-Appellee.**

**No. 84–1252.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 14, 1985.

Decided July 29, 1985.

Sanford Svetcov, Asst. U.S. Atty., San Francisco, Cal., for plaintiff-appellant.

James F. Hewitt, San Francisco, Cal., for defendant-appellee.

---

* The Honorable Jesse W. Curtis, Senior United States District Judge for the Central District of California, sitting by designation.

Before HUG and SKOPIL, Circuit Judges, and CURTIS,* District Judge.

HUG, Circuit Judge:

This is an appeal concerning the pretrial exclusion of evidence under Rule 403 of the Federal Rules of Evidence. Laurence John Layton ("Layton") was charged with conspiracy to murder and aiding and abetting the murder of Congressman Leo Ryan, and also with conspiracy to murder and aiding and abetting the attempted murder of Richard Dwyer, the Deputy Chief of Mission of the United States in the Republic of Guyana. Layton's first trial ended in a hung jury. Prior to retrial, the Government sought the admission of certain evidence under Fed.R.Crim.P. 12(b) that had been excluded in the first trial. The district judge ruled the evidence inadmissible as hearsay. The Government appealed, and we ruled that three of the four statements involved were admissible under the hearsay rules, but we remanded for a determination of their admissibility under Fed.R.Evid. 403. The district judge ruled that two of the statements were admissible but excluded the recorded statements made by Jim Jones in the "Last Hour Tape" made while the mass suicides were taking place. The Government appeals that order. We affirm.

## FACTS AND PROCEEDINGS BELOW

The facts of this case, as represented by the Government's offer of proof, have been thoroughly discussed by this court in *United States v. Layton*, 720 F.2d 548 (9th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 1423, 79 L.Ed.2d 748 (1984) (*Layton I*), and need not be fully recounted here. In brief, Layton was a member of the People's Temple, a religious organization founded by Jim Jones. The People's Temple had a settlement known as Jonestown, consisting of approximately 1200 members, located in the Republic of Guyana.

On November 17 and 18, 1978, Congressman Ryan and his party conducted an investigation of conditions in Jonestown. On November 18, Congressman Ryan arranged for the departure of Jonestown residents who desired to return to the United States. While the Ryan party was still preparing to depart from Jonestown, Layton and Jones were seen engaged in a conversation.[1] After the conversation ended, Layton announced that he, too, wished to leave Jonestown. Some of the departing Jonestown residents became concerned, believing that Layton was feigning defection.

There were two planes, a 19-seat Otter and a 6-seat Cessna, arranged for the Ryan party at the Port Kaituma airstrip. Some of the departing Jonestown residents had boarded the Cessna. Layton insisted on travelling on the Cessna, and proceeded to board the plane. Layton was then told to leave the plane, and reluctantly submitted to a weapons search. Although the search did not reveal any weapons, and he was permitted to reboard the Cessna, Layton did, nevertheless, have a gun on the airplane. Layton later claimed that he was given the gun by a Temple member named Poncho, but the gun may have been passed to him by Joe Wilson, a People's Temple member, who hugged Layton and put his hand underneath the poncho that Layton was wearing shortly before Layton boarded the plane.

When the Cessna was fully boarded, others were still in the process of boarding the Otter. The Cessna taxied down the runway, preparing to take off. At this point, a tractor-trailer cut in front of the Cessna and moved toward the Otter. A group of People's Temple members, including Wilson, began shooting from the tractor-trailer at the larger plane, hitting people inside as well as outside the plane. Congressman Ryan, who was standing outside near the Otter, was among those shot and killed. Other people were wounded, including Dwyer. The Cessna passengers heard the gunfire. Layton insisted that the plane

take off and then took a revolver from his crotch area and shot two of the passengers. A struggle ensued and Layton was disarmed. The occupants of the Cessna then escaped into the jungle.

Layton was indicted and tried on four counts arising from the killing of Congressman Ryan and the wounding of Dwyer. Layton was charged with (1) conspiracy to murder a Member of Congress in violation of 18 U.S.C. § 351(d); (2) aiding and abetting the murder of a Member of Congress in violation of 18 U.S.C. §§ 2, 351(a); (3) conspiracy to murder an internationally protected person (Dwyer) in violation of 18 U.S.C. § 1117; and (4) aiding and abetting the attempted murder of an internationally protected person in violation of 18 U.S.C. §§ 2, 1116(a).

Layton's trial resulted in a mistrial because the jury was unable to reach a verdict. The Government then moved for an order to present certain statements made by Jim Jones as evidence on retrial that the court had ruled inadmissible during the trial. The Government's motion was denied, and the Government appealed. We reversed in part, holding that three of the four challenged statements were admissible under the hearsay rule and the confrontation clause, but we remanded to the district court to allow the court to determine whether the statements were admissible under Fed.R.Evid. 403. *Layton I,* 720 F.2d 548 (9th Cir.1983), *cert. denied,* — U.S. ——, 104 S.Ct. 1423, 79 L.Ed.2d 748 (1984).

The district court found that the so-called "Last Hour Tape" (the "Tape") was inadmissible under Rule 403. The Tape records statements made by Jim Jones soon after the Ryan party left Jonestown for the airstrip. Screams of dying children can be heard in the background. Pertinent portions of Jones's statements on the Tape are as follows:

Jones: ... How very much I have loved you ... how very much I have tried my best to give you the good life ... But in spite of all that I've tried, a handful of

---

**1.** There is a dispute as to whether, as the Government claims, Joe Wilson and Tom Kice, two other members of the People's Temple, participated in the conversation.

our people, with their lives, have made our life impossible. There's no way to detach ourself from what's happened today. Not only—We're in a compound situation, not only are there those who have left and committed the betrayal of the century, some have stolen children from others and they're in pursuit right now to kill them because they stole their children, and we, we are sitting here waiting on a powder keg. I don't think this is what we want to do with our babies. I don't think that's what we had in mind to do with our babies. It was said by the greatest of prophets, from time immemorial, "No man lay, takes my life from me, I lay my life down." ... So, to, to sit here and wait for the castastrophe that's going to happen on that airplane, it's gonna be a catastrophe ... It almost happened here, almost happened, the congressman was nearly killed here ... But you can't steal people's children. (Crowd: That's right.) You can't take off with people's children without expecting a violent reaction. (Crowd: That's right.) And, that's not so unfamiliar to us, either, if we, even if we were Judeo-Christian, even if we weren't Communists. The world, the kingdom suffers violence and the violent shall take it by force. If we can't live in peace then let's die in peace ... We've been so betrayed, we have been so terribly betrayed. But we've tried, and as Jack Beam often said, and I don't know where he's at right this moment, poor Jack, he says if it's only worked one day, it was worthwhile ... Of what's going to happen here in a matter of a few minutes, is that one of those people on that plane is gonna, gonna shoot the pilot. I know that. I didn't plan it, but I know it's gonna happen. They're gonna shoot that pilot, and down comes that plane into the jungle and we had better not have any of our children left when it's over, 'cause they'll parachute in here on us. I'm telling you just as plain as I know how to tell you, I've never lied to you ... (Crowd: That's right.) I never have lied to you. (Crowd: That's right.) I know

that's what's gonna happen, that's what he intends to do and he will do it. He'll do it.... Fortunately, being so bewildered with many, many pressures on my brain, seeing all these people behave so treasonous, it was just too much for me to put together, but, I now know what he was telling me and it'll happen. If the plane gets in the air even. So my opinion is that we be kind to children and be kind to seniors and take the potion like they used to take in ancient Greece, and step over quietly because we are not committing suicide. It's a revolutionary act. We can't go back. They won't leave us alone. They're now going back to tell more lies which means more congressmen. And there's no way, no way we can survive.

. . . .

There's one man there, who blames, and rightfully so, Debbie Blakey, for the murder, for the murder of his mother and ... he'll stop that pilot by any means necessary. He'll do it. That plane will come out of the air. There's no way you fly a plane without a pilot.

. . . .

Apparently after learning of the shooting, Jones continued:

Jones: I don't know how in the world they're ever gonna write about us. It's just too late, it's too late. The Congressman's dead, the Congressman lays dead, many of our traitors are dead, they're all laying out there dead. (Unknown female: right on) Mmmm? ... (Crowd: good, good) ... I didn't but, but my people did. My people did. They're my people ... (Crowd: that's right, right) ... and they, they've been provoked too much ... (Crowd: that's right, right) ... They've been provoked too much. What's happened here's been to, this has been an act of provocation....

. . . .

Jones: It's not to be feared. It is not to be feared. It's a friend, it's a friend. You're sitting there. Show your love for one another ... (Unknown male: (inaudible) don't let them take me.) ... let's

get calm, let's get calm, let's get calm ... to us. We had nothing we could do, we can't, we can't separate ourselves from our own people.... For twenty years laying in some old rotten nursing home ... taken us through all these anguished years. They took us and put us in chains and that's nothing ... (stuttering) ... there's no comparison to that, to this. They've robbed us of our land, and they've taken us and driven us until we tried to find ourselves. We tried to find a new beginning, but it's too late. You can't separate yourself from your brother and your sister. No way I'm gonna do it. I won't, I refuse. I don't know who fired the shot, I don't know who killed the Congressman. But as far as I'm concerned, I killed him. You understand what I'm saying? I killed him. He had no business coming. I told him not to come ... (long pause) ... die with respect, die with a degree of dignity. Lay down your life with dignity. Don't lay down with tears and agony. It's nothing to death, just like Mack said. It's just stepping over into another plane. Don't, don't be this way. Stop this hysterics. This is not the way for people who are socialistic Communists to die, no way for us to die. We must die with some dignity ...

Unknown male: That's right....

Jones: ... soon we'll have no choice. Now we have some choice. You think they're gonna send, allow this to be done and allow us to get by with this. You must be insane ... But children, it's just something to put you to rest. Oh, God. Mother, mother, mother, mother, mother, please, mother, please, please, please, don't, don't do this, don't do this. Lay down your life with your child, but don't do this ...

Unknown female: Children (inaudible) see you

Jones: Free at last ... please, keep your emotions down, keep your emotions down. Children, it will not hurt if you will be, if you'll be quiet, if you'll be quiet ... it's never been done before you say? It's been done by every tribe in history, every tribe facing annihilation. All the Indians of the Amazon are doing it now. They refuse to bring any babies into the world. They kill every child that comes into the world, because they don't want to live in this kind of a world. So be patient, be patient. Death is—I tell you I don't care how many screams you hear, I don't care how many anguished cries—death is a million times preferable to ten more days of this life. If you knew what was ahead of you, if you knew what was ahead of you, you'd be glad to be stepping over tonight. Death, death, death is common to people. And the Eskimos, they take death in their stride. Let's be dig-, let's be dignified. If you'll quit telling them they're dying, if you adults will stop some of this nonsense. Adults, adults, adults, I call on you to stop this nonsense. I call on you to quit exciting your children when all they're doing is going to a quiet rest....

The Government appeals the district court's exclusion of the Tape under Rule 403.

## DISCUSSION

### A. Standard of Review

█ Federal Rule of Evidence 403 provides in part:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury ....

The Rule 403 weighing process—that of balancing the probative value of the proffered evidence against its potential for unfair prejudice or confusion of the issues—is primarily for the district court to perform. *Longenecker v. General Motors Corp.*, 594 F.2d 1283, 1286 (9th Cir.1979). The district court's admission or exclusion of evidence under Rule 403 will be reversed only if it was an abuse of discretion. *United States v. Gering*, 716 F.2d 615, 620 (9th Cir.1983); *Liew v. Official Receiver and Liquidator*, 685 F.2d 1192, 1195 (9th Cir.1982).

The Government argues that, because the discretion traditionally accorded to trial courts depends upon their ability to view witnesses and assess the impact of evidence during trial, appellate courts are freer to perform independently the Rule 403 balancing process when the issue arises on an *in limine* motion before trial, as was the case here. There is case law that supports the Government's proposition. *See United States v. King,* 713 F.2d 627, 631 (11th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 1924, 80 L.Ed.2d 470 (1984). Indeed, we have stated that "[w]e give wide latitude to the trial judge in determining the admissibility of evidence because he is in the best position to assess the impact and effect of evidence based upon what he perceives from the live proceedings of a trial, while we can review only a cold record." *United States v. Ford,* 632 F.2d 1354, 1377 (9th Cir.1980), *cert. denied,* 450 U.S. 934, 101 S.Ct. 1399, 67 L.Ed.2d 369 (1981). However, this is not the sole basis for reposing the trial court with wide discretion under Rule 403; there are other important policies embodied in Rule 403 that mandate appellate deference.

One important basis for the wide discretion exercised by the district courts in these cases is found in the broad contours of Rule 403 itself. The considerations which arise under Rule 403, such as the potential for undue prejudice or confusion of the issues, are susceptible only to case-by-case determinations, requiring examination of the surrounding facts, circumstances, and issues. *See* D. Louisell & C. Mueller, *Federal Evidence* § 124, at 10 (1978). Thus, it is more difficult in these cases for appellate courts to formulate rules of decision to govern future cases. As one commentator has stated:

> Many issues that arise in litigation are not amenable to regulation by rule because they involve multifarious, fleeting, special, narrow facts that utterly resist generalization.... When the ruling under attack is one that does not seem to admit of control by a rule that can be formulated or criteria that can be indicated, prudence and necessity agree it

should be left in the control of the judge at the trial level.

Rosenberg, *Judicial Discretion of the Trial Court, Viewed From Above,* 22 Syracuse L.Rev. 635, 662 (1971) (Rosenberg, *Judicial Discretion* ). *See also* Gold, *Federal Rule of Evidence 403: Observations on the Nature of Unfairly Prejudicial Evidence,* 58 Wash.L.Rev. 497, 499 (1983) ("Implicit in the creation of this discretionary power is the assumption that truth and justice cannot be captured by mere language, but require the intervention of human sensibilities."). A failure to accord substantial deference to the evidentiary rulings of a trial court under Rule 403, which rulings are so heavily dependent upon the facts and circumstances of each case, would be an unproductive and unwarranted interference with the trial processes that must depend, of necessity, on some degree of finality, whether made before or during the trial.

■ A district court is vested with discretion as to whether to hear a motion to exclude evidence before trial in an *in limine* proceeding such as employed in this case. *Layton I,* 720 F.2d at 553. If the judge enters an order excluding evidence, the Government may appeal the order under 18 U.S.C. § 3731, if it is made prior to the time the defendant is put in jeopardy and certain other statutory requirements are met. *Layton I,* 720 F.2d at 553–54. Were we to review these pretrial rulings under a less deferential standard than applied to such evidentiary rulings during trial, we would discourage the use of the pretrial *in limine* procedure and also encourage more frequent appeals. There is general agreement that pretrial hearings are extremely useful where important and complex admissibility issues are presented, since any inquiry into the facts is best made out of the earshot of the jury. *See* 22 C. Wright & K. Graham, *Federal Practice and Procedure: Evidence* § 5224, at 320–21 (1978), and cases cited therein. However, concern for the potential of protracted litigation over evidentiary issues could discourage district courts from utiliz-

ing pretrial *in limine* procedures, even though such procedures would otherwise be suitable under the circumstances. For the above reasons, we hold that pretrial *in limine* evidentiary rulings are to be accorded the same deference on appeal as rulings made during trial. We note that in this case there is an additional reason why the district court is in a better position to evaluate probity against the potential prejudice and distracting effect of the Tape. The district court presided over the first trial, and had the benefit of evaluating the Tape against the background of a live proceeding over which he had previously presided.

### B. Merits

#### 1. *Probative Value*

The district court stated that

> the court is not convinced that this Tape carries a high probative value ... [I]t is difficult to discern what point, if any, the Tape proves. The statements contained in the Tape are rambling and confused. Based on this evidence, the court cannot conclude that this Tape actually inculpates the defendant in any crimes with which he has been charged.

The Government claims that the district court's probity finding was erroneous. According to the Government, Layton's defense counsel had argued at trial that Layton was unaware of the plan to kill Ryan and that he acted separately, intending only to kill the "defectors" on the small plane. The Government argues that the Tape contradicts Layton's defense and provides a "conspiratorial link" between Jones and Layton. In *Layton I*, we indicated that Jones made specific reference to Layton on the Tape:

> Jones's reference to Debbie Blakey in the passage quoted in the text indicates that he was referring to Layton as the person who would shoot the pilot. Blakey was Layton's sister and apparently Layton blamed her for his mother's death.

720 F.2d at 562 n. 11.

In the quoted statement, Jones said that "one of those people on the plane" is going to shoot the pilot. Through the Debbie Blakey reference, this appears to refer to Layton. However, the plane that Layton insisted on boarding was not the plane the Congressman or Dwyer was going to board. Thus, the link to the Congressman or Dwyer is not furthered to any great extent. The Tape does not indicate that Layton was informed of a plan to kill the Congressman or Dwyer.

While it is true that the Tape indicates that Jones believed Layton was going to shoot the pilot of one of the planes, it provides but a weak inference at best of any conspiracy to kill the Congressman or Dwyer. Although Jones said he knew Layton was going to shoot the pilot, he said "I didn't plan it but I know it is going to happen." He also later said "being so bewildered with many, many pressures on my brain, seeing all these people behave so treasonous, it was just too much for me to put together, but, I now know what he was telling me and it'll happen." This does not indicate a conspiracy between Jones and Layton, but rather that Jones only later realized what Layton was telling him about shooting the pilot.

The portion of the Tape in which Jones said "I don't know who fired the shot. I don't know who killed the Congressman, but as far as I'm concerned I killed him" provides a possible inference that he was involved in a conspiracy to kill the Congressman. However, this inference is also a weak one at best, as it seems more likely, in the context of the entire Tape, that Jones was rhetorically assuming responsibility for the actions of his people simply because he was the leader of the People's Temple.

Thus, the probative value of the Tape is weak. Other evidence establishes the same fact—that Jones knew that Layton was going to the airport to engage in acts of violence—without the potential prejudice and confusion of the Tape. The availability of this evidence is a factor to be evaluated in the balance. *See Lies v. Farrell Lines, Inc.,* 641 F.2d 765, 773 (9th Cir.1981). The other proffered evidence, as characterized in *Layton I,* is testimony from Charles Garry, Jones's lawyer,

that shortly after the Ryan party left for the airstrip, Jones had told him that Layton and Parks had taken all the weapons from Jonestown and were proceeding to the airstrip to engage in violent acts; that all was lost at the time; that Layton was not a defector, but was going to the airstrip to carry out a mission of violence.

720 F.2d at 558. The Government argues that Jones's statement to Garry was unrecorded and that, without the admission of the Tape, Garry's testimony would be uncorroborated. While this is true, the Government fails to suggest any basis for finding Garry's testimony unreliable.

### 2. *Prejudice and Confusion of the Issues*

The district court concluded that the admission of the Tape into evidence would be unduly prejudicial.

It would be virtually impossible for a jury to listen to this Tape and ignore the sounds of innocent infants crying (and presumably dying) in the background. The discussion of the impending mass suicide set against the background cacophony of innocent children who have apparently already been given poison would distract even the most conscientious juror from the real issues in this case.

The Government argues that the district court should have attempted to utilize procedures to minimize the potential prejudice, such as a limiting instruction to the jury. The district court found that a limiting instruction could not compensate for the prejudicial and distracting effects of the Tape. The question of whether the prejudicial and distracting effects of evidence can be adequately moderated by a cautionary instruction is committed to the discretion of the district court. *United States v. Masters*, 622 F.2d 83, 87–88 (4th Cir.1980). The problem that concerned the district judge is the distracting emotional impact on the jury and the effect it would have in confusing the issues. Unlike a case where the evidence is unduly complicated and where confusion may be obviated by a clarifying instruction, *see e.g., United States v.*

*Hans*, 684 F.2d 343, 346 (6th Cir.1982), it is unlikely that a jury instruction could effectively mitigate the emotional impact and distracting effect of the Tape. The district court did not abuse its discretion in finding that a limiting instruction would be of no avail. *See White v. Cohen*, 635 F.2d 761, 762–63 (9th Cir.1981) (despite curative instruction, prejudicial statements on tape played before the jury irreparably tainted the trial).

We have heard the Tape and agree with the district court with regard to its emotional impact and distracting effect. The Tape would tend to divert the jury's attention from the issues in this case to a significant amount of extraneous matter. As a result, there would be a considerable potential for unfair prejudice and confusion of the issues.

### CONCLUSION

The district judge acted within his discretion in finding that the relatively minimal probative value of the Tape is substantially outweighed by its potential for unfair prejudice and confusion of the issues.

AFFIRMED.