STATE of Utah, Plaintiff and Appellee,

v.

John Henry MAURER, Defendant and Appellant.

No. 860006.

Supreme Court of Utah.

Feb. 28, 1989.

Rehearing Denied March 17, 1989.

Nancy Bergeson and James Bradshaw, Salt Lake City, for defendant and appellant.

R. Paul Van Dam, Sandra L. Sjogren, Salt Lake City, for plaintiff and appellee.

HOWE, Associate Chief Justice:

Defendant John Henry Maurer was convicted by a jury of second degree murder in violation of Utah Code Ann. § 76–5–203 (1978, Supp.1988). He was sentenced to an indeterminate term of five years to life in the Utah State Prison. He appeals, assailing the trial court's admitting into evidence a letter he wrote to the victim's father over a month after the homicide.

Defendant met the victim, Janet Hannan, in 1984, and they began living together in a condominium in June of that year. In October of 1984, Janet and defendant became engaged to be married. Their relationship apparently was without major problems until January of 1985, when she apparently indicated some affection for Mike Bickley, a close friend of defendant's. On January 30, Janet, upon encouragement from her father, telephoned defendant and told him the engagement was off and not to come home. Defendant nevertheless came home to talk to her, and she told him that their relationship was over and that he should return the following morning to remove his belongings.

Defendant left the condominium in a state of emotional turmoil and called a suicide hotline. He was referred to a hospital, where he spoke with doctors and was diagnosed as suffering from "acute situational anxiety and grief reaction." He telephoned his mother, who lived out of state, and asked her to call Janet at the condo-

minium the next morning and persuade her to reconsider her decision. A doctor gave him some valium, and he left with another friend, Ed Gutierrez.

Defendant and Ed went to Ed's apartment, where they talked for about three hours. Defendant was crying at times and seemed depressed. He slept for two or three hours and then the next morning left Ed to return to the condominium to meet Janet and move his clothing out. On the way, he again stopped at the hospital to get some valium.

Janet and Mike arrived at the condominium soon after defendant. Janet was staunch in her decision to break off their relationship and began to move defendant's clothing out of the bedroom. At one point, defendant's mother telephoned and spoke with Janet. He perceived from Janet's end of the conversation that his mother sided with her. Defendant paced from the kitchen to the living room to the bedroom, alternating between crying and being very calm. He hugged Janet and Mike and told her she deserved someone better than himself. He asked Mike, "Don't you feel guilty about this?" Mike said, "Yes," and that he felt so guilty that he had difficulty having sexual relations with Janet. This comment apparently enraged defendant, and he rushed to the kitchen, grabbed a knife, and went into the bedroom, where Janet was packing his clothes, and stabbed her in the back. Defendant fought with Mike when he tried to summon help. Janet died shortly thereafter.

Defendant was charged with second degree murder, and while in jail awaiting trial, had written a letter to the victim's father on March 10, 1985. This was thirty-eight days after the homicide. The letter reads as follows:

3/10/85

To Mike Hannon,

Just a letter to let you know that I'm glad I killed Janet. "Daddy's Little Girl" is no more. You spoiled her rotten. Thank God you were not there that morning. You might have prevented it. I hope you feel guilt over it.

It was a great feeling to watch her die. She kept crying "It hurts, It hurts". I should hope so, I mean it was a 13 inch kitchen knife. Mike Bickley got to watch her die too. It was great. Your daughter was nothing but a whore, a fucking whore. Drifting from one man to another. She couldn't break the engagement herself. No Daddy had to demand that she make a decision. God she was 29 and couldn't function or live without you doing everything for her.

So you had her buried in the Catholic section of the Salt Lake Cemetary [sic]. After her having an abortion? You fucking cover up artists, I hope her her [sic] death hurt you. Or are you relieved? What a stupid bitch she was. She did everything in the relationship and I sat back and did very little. I love it! She was so emotional and stupid. But basically a real whore. What are you going to do now? Bring her back from the dead. You should have been there that morning to prevent the murder. Hope you enjoyed your skiing that day. The laughs [sic] on you.

The killer
John H. Maurer

Prior to trial, defendant filed a motion *in limine* to preclude the State from introducing the letter into evidence at trial. The trial court denied the motion on the basis that the letter was probative of defendant's state of mind at the time of the homicide and thus would assist the jury in determining whether defendant was guilty of second degree murder or only of the lesser offense of manslaughter.

 Subsequently, defendant petitioned the court for a rehearing on his motion, and argument was heard again just prior to trial. His counsel conceded that the letter was not hearsay under rule 801(d)(2), Utah Rules of Evidence, because it was an admission by a party-opponent, but argued that there was no material issue as to who killed the victim. He stated that he was prepared to stipulate that defendant did kill her. He pointed out that the only issue to be addressed by the jury was whether defendant intentionally killed

the victim, which would be second degree murder, or whether he killed her while acting under the influence of extreme mental or emotional disturbance for which there was a reasonable explanation or excuse, which would constitute manslaughter. Defense counsel further argued that the letter was not admissible as evidence of defendant's state of mind at the time of the homicide because the letter was written at a time too remote to reflect accurately whether he was under extreme mental or emotional disturbance when he killed the victim. Finally, he argued that even if the letter had some relevance on the issue of state of mind, the prejudicial effect of the letter far exceeded its potential relevance under rule 403, Utah Rules of Evidence, which states:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

The State argued that the letter was admissible as an admission and that the letter was relevant to prove the State's theory that defendant intentionally killed the victim without any justification or mitigation. The trial court again denied the motion to exclude the letter from evidence, concluding that "the probative value of the letter goes to the state of mind of defendant ... on the date the offense allegedly occurred." The court further found that "the probative value is not outweighed by the danger of unfair prejudice, confusion of the issues, nor is there any chance of misleading the jury...." The entire letter was admitted into evidence at trial over defendant's objection.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Utah R.Evid. 401. Both the State and defendant are in agreement that the central issue to be determined by the jury was defendant's state of mind at the time he killed the victim. That being so, the first five sentences of the second paragraph of the letter were arguably relevant. They read: "It was a great feeling to watch her die. She kept crying 'It hurts, It hurts'. I should hope so, I mean it was a 13 inch kitchen knife. Mike Bickley got to watch her die too. It was great." These sentences can fairly be interpreted to reflect defendant's recollection of his own mental state and impressions at the time of the killing.

Except for these sentences, the balance of the letter reflects defendant's state of mind at the time the letter was written. It displays his callousness toward the killing which he expresses in profane and vulgar language and manifests his complete insensitivity to this tragedy. The letter taunts the victim's father and was designed to inflict guilt upon him and add to the grief he must have then been feeling. However, because of its shocking display of lack of remorse by defendant and the repulsiveness of his expressions toward the victim and her father, the balance of the letter may well have been highly inflammatory in the eyes of the jury. It would be difficult to draft a letter which would be more repulsive to the notion of the value of human life than was this letter. We are cognizant of the rule that the appraisal of the probative and prejudicial value of evidence under rule 403 is generally entrusted to the sound discretion of the trial judge and will not be upset on appeal absent manifest error. *State v. Miller*, 709 P.2d 350, 353 (Utah 1985). Notwithstanding the salutariness of that rule, we cannot conclude otherwise than that the balance of the letter contained little or no relevance to the central issue and that any relevance which could be found therein was greatly and clearly outweighed by the danger of "unfair prejudice, confusion of the issues, [and] misleading the jury." Utah R.Evid. 403. The trial court's admission of the entire letter was clearly erroneous. Utah R.Civ.P. 52(a) (applicable in criminal cases by virtue of Utah Code Ann. § 77–35–26(7) (1982, Supp.1988); *see State v. Walker*, 743 P.2d 191 (Utah 1987)).

Our rule 403 is verbatim to rule 403, Federal Rules of Evidence, to which the Advisory Committee's note reads "that certain circumstances call for the exclusion of evidence which is of unquestioned relevance. These circumstances entail risks which range all the way from inducing decision on a purely emotional basis, at one extreme, to nothing more harmful than merely wasting time, at the other extreme." Fed.R.Evid. 403 advisory committee's note, *quoted in* M. Graham, *Handbook of Federal Evidence* § 403.1, at 178 (2d ed.1986). " 'Unfair prejudice' within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Id.* "In reaching a decision whether to exclude on grounds of unfair prejudice ... [t]he availability of other means of proof may also be an appropriate factor." *Id.* Graham explains:

> Since all effective evidence is prejudicial in the sense of being damaging to the party against whom it is offered, prejudice which calls for exclusion is given a more specialized meaning: an undue tendency to suggest decision on an improper basis, commonly but not necessarily an emotional one, such as bias, sympathy, hatred, contempt, retribution or horror. Where a danger of unfair prejudice is perceived, the degree of likely prejudice must also be considered. The mere fact that evidence possesses a tendency to suggest a decision upon an improper basis does not require exclusion; evidence may be excluded only if the danger of unfair prejudice substantially outweighs the probative value of the proffered evidence.

Graham at 182–83.

The following expressions in federal cases illustrate the interpretation given to rule 403 by a number of federal courts: *United States v. Bailleaux*, 685 F.2d 1105, 1111–12 (9th Cir.1982) ("*Unfair* prejudice results from ... that aspect of the evidence which makes conviction more likely because it provokes an emotional response in the jury or otherwise tends to affect adversely the jury's attitude towards the defendant wholly apart from its judgment as to his guilt or innocence of the crime charged."); *Carter v. Hewitt*, 617 F.2d 961, 972–73 (3d Cir.1980) ("It is unfairly prejudicial if it 'appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish,' or otherwise 'may cause a jury to base its decision on something other than the established propositions in the case.' "); *United States v. McRae*, 593 F.2d 700, 707 (5th Cir.) (the major function of rule 403 "is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect ... to permit the trial judge to preserve the fairness of the proceedings by exclusion despite its relevance"), *cert. denied*, 444 U.S. 862, 100 S.Ct. 128, 62 L.Ed.2d 83 (1979).

In *Pearce v. Wistisen*, 701 P.2d 489, 493 (Utah 1985), we recognized that "precedent ... is of little value" in reviewing whether a trial court has correctly made the balancing test required by rule 403. "We simply determine whether, on the facts of the particular case, the trial court's ruling was within the reasonable or permissive range." (Citing *Carlson v. Piper Aircraft Corp.*, 57 Or.App. 695, 646 P.2d 43 (1982)). Nevertheless, the cases which follow illustrate the bounds of the "reasonable or permissive range" of discretion.

Application of rule 403 by a federal district court to exclude from evidence the so-called "Last Hour Tape" was upheld in *United States v. Layton*, 767 F.2d 549 (9th Cir.1985). The defendant was charged with conspiracy to murder a congressman and the Deputy Chief of Mission of the United States in Guyana, aiding and abetting the murder of the congressman, and aiding and abetting the attempted murder of the Deputy Chief of Mission. The defendant was a member of the People's Temple, a religious organization founded by Jim Jones in a settlement known as Jonestown, consisting of approximately 1,200 members, located in the Republic of Guyana. Congressman Leo Ryan was assassinated and the Deputy Chief of Mission was wounded as they attempted to provide an escape and transportation for members of

the organization who wished to return to the United States.

In its effort to convict the defendant of conspiracy, the government sought to admit into evidence the "Last Hour Tape" made by Jim Jones while mass suicides were taking place. The tape records statements made by Jim Jones soon after Congressman Ryan's party left Jonestown for the airstrip. Jones is encouraging all of his followers to commit suicide by drinking poison. Screams of dying children can be heard in the background. The government argued that the statements made by Jones in the tape were highly probative of a conspiracy between him and the defendant to commit the charged crimes. In spite of the apparent relevance of the statements contained in the tape and the government's attempts to utilize procedures to minimize the potential prejudice, the district court refused its admission on grounds of unfair prejudice and confusion of the issues. Said the court:

> It would be virtually impossible for a jury to listen to this Tape and ignore the sounds of innocent infants crying (and presumably dying) in the background. The discussion of the impending mass suicide set against the background cacophony of innocent children who have apparently already been given poison would distract even the most conscientious juror from the real issues in this case.

The Ninth Circuit agreed:

> We have heard the Tape and agree with the district court with regard to its emotional impact and distracting effect. The Tape would tend to divert the jury's attention from the issues in this case to a significant amount of extraneous matter. As a result, there would be a considerable potential for unfair prejudice and confusion of the issues.

*Layton,* 767 F.2d at 556.

A less dramatic example of exclusion of evidence under rule 403 is found in *United States v. Barletta,* 652 F.2d 218 (1st Cir. 1981). The government sought to admit into evidence in a criminal trial a tape recording of a conversation between the defendant and a government informant. The apparent purpose of the informer's telephone call was to obtain an admission from the defendant that he had participated in criminal conduct several months before. Although relevant, the court explained why the tape's potential for prejudice substantially outweighed any probative value:

> [T]he overall context of the tape could legitimately be found prejudicial by virtue of its tendency to suggest a kind of "guilt by association". The court might reasonably have concluded that a jury would ascribe undue influence to the mere fact that a defendant had a casual conversation with an admitted criminal, leading to a conviction based on a generalized assessment of character. *This possibility might be thought particularly acute where, as here, the conversation includes obscenities, ethnic slurs, and otherwise coarse language,* warped and suffused with an aura of nonspecific criminality because of the very medium of a governmentally planned clandestine overhearing.

*Barletta,* 652 F.2d at 220 (emphasis added).

Two state court decisions also illustrate application of the rule of evidence embraced by rule 403. In *State v. Pendergrass,* 179 Mont. 106, 586 P.2d 691 (1978), the defendant appealed his convictions of attempted robbery and sexual intercourse without consent. He sought reversal on the ground that a tape recording by the police of the victim's telephone call for assistance immediately following the incident should not have been admitted in evidence and played to the jury. He argued that the unfair prejudice of the evidence substantially outweighed any probative value and simply created sympathy for the victim. He further argued that the highly emotional nature of the recording created a climate of outrage in the minds of the jury, denying him a fair trial. The state, however, argued that the tape was admissible to prove that a rape had occurred and bolstered the victim's credibility, her attention to detail, her ability to recall, and whether she had been placed in fear of her life.

The Supreme Court of Montana ruled that there was reversible error under rule 403, Montana Rules of Evidence (substantially identical to federal and Utah rule 403), in admitting the tape and playing it to the jury. The state had clear proof of rape without the tape, and there was no necessity for or instructive value in its admission. Ruling that the probative value was substantially outweighed by unfair prejudice, the court reasoned:

> The tape was highly prejudicial to defendant. Aside from any relevance heretofore pointed out, it contained emotional and nearly incoherent outpourings of the victim in the immediate aftermath of a violent crime. These utterances necessarily induced a feeling of outrage against the defendant and sympathy for the victim. Undue prejudice against defendant was created and a fair trial climate was destroyed by this tape.

*Pendergrass*, 586 P.2d at 694.

In *State v. Marlar*, 94 Idaho 803, 498 P.2d 1276 (1972), the defendant was charged with assault with a deadly weapon, growing out of an altercation he had with the victim when he observed him sitting with the defendant's wife in her car, where they were conversing and possibly embracing. At trial, the victim was permitted to testify that after the incident but prior to trial, the defendant telephoned him for the purpose of persuading him to drop the criminal charges. In the conversation, the defendant allegedly threatened the victim by saying, "I'll put you in the morgue." The Idaho court reversed the defendant's conviction and ordered a new trial because of the erroneous admission of the telephone call. The Idaho court determined that the statement "I'll put you in the morgue" did not in itself tend to establish an intent or state of mind at the time of the commission of the criminal offense. Said the court: "The statement, at most, was an opprobrious remark illustrating the caller's malevolent attitude towards the witness Higgins at the time the statement was made." *Marlar*, 498 P.2d at 1283. The court further held that even if it could glean some probative value from the telephone conversation, it would be so slight that its admittance into evidence would not be justified in light of the possible prejudice to the defendant. The court stated that because of the inflammatory effect which the threat might have on the jury, it should not have been admitted.

In the instant case, defendant admitted the killing, and the principal issue for the jury to determine was his state of mind at the time of the killing. The State had several witnesses to establish that. Mike Bickley was present at the time, and he testified that after the stabbing, defendant had a "strange smile" on his face. Paramedics who answered Mike's call for help saw defendant upon their arrival. They described him as "laughing," more or less "pleased," having a "smart aleck grin" and a "cold, mean stare" and that "he had a crazed look in his eyes, as if he had seen a ghost." Some of this testimony coincides with defendant's statement in his letter that "[i]t was a great feeling to watch her die." The balance of the letter, which expresses defendant's vindictiveness and complete lack of remorse, reflected little or nothing on his state of mind at the time of the killing. Several of the cases discussed above have held that where the prosecution has other evidence available to prove an element of the crime, that fact should be weighed in determining whether to admit pieces of evidence which contain some relevant statement but also contain inflammatory statements which might lead the jury to decide the defendant's guilt on an improper basis. *United States v. Layton; State v. Pendergrass.* We relied on this fact in *State v. Cloud*, 722 P.2d 750, 754 (Utah 1986), in holding that it was reversible error to admit into evidence a photograph showing an allegedly obscene gesture by a homicide victim, arguably indicating that she defied the defendant and that this motivated him to kill her. We there stated: "The record does not support a finding that evidence of this gesture could not have been presented to the jury readily and accurately by other means, such as the testimony of the investigating officers or the medical examiner."

In the instant case, the prosecutor referred to the letter in his arguments to the jury. In his opening statement, he referred to the letter as an "especially crucial piece of evidence." In his closing argument, he said that the letter referred to the victim in "terms disgusting for human beings" and that the letter blamed others for the killing while showing no remorse. These remarks, together with the letter, clearly could have provoked an emotional response from the jury and provoked its instinct to punish or otherwise divert the jury from its task to determine the mental state of defendant at the time of the killing. We disapproved the prosecution's similar use of the photograph in *State v. Cloud.*

Defendant's conviction is reversed, and the case is remanded to the trial court for a new trial.

STEWART, DURHAM and ZIMMERMAN, JJ., concur.

HALL, Chief Justice (dissenting):

I do not join the Court in concluding that only portions of defendant's letter were admissible in evidence.

The sole issue at trial was defendant's state of mind at the time the offense was committed. The trial judge duly considered the admissibility of the letter and fairly concluded that it was probative of defendant's state of mind at the time of the murder and that it would assist the jury in determining whether defendant was guilty of second degree murder or only the lesser offense of manslaughter. It was well within the discretion of the trial judge to determine the probative value of the letter and its admissibility. I would therefore not disturb his ruling.[1] Indeed, the entire context of the letter either directly or inferentially bears upon defendant's mental state at the time of the killing.

In any event, even if it be assumed that it was error not to exclude portions of the letter from evidence, the error was harmless.

In order to constitute reversible error, the error complained of must be substantial and prejudicial, such that there is a reasonable likelihood that in its absence, there would have been a more favorable result for the defendant.[2] No such likelihood exists in this case. The record contains substantial circumstantial evidence of defendant's intention to commit murder. That evidence, coupled with the plain, unambiguous direct evidence of defendant's state of mind contained in the first five sentences of the second paragraph of his letter, leaves no reasonable likelihood that a new trial in this case will produce a different or more favorable result for defendant.

I would affirm.

---

1. *State v. Miller,* 709 P.2d 350, 353 (Utah 1985).

2. *State v. Tillman,* 750 P.2d 546, 561 (Utah 1987).