**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Michael Leslie BLAYLOCK, Defendant–Appellant.**

**Nos. 92–50405, 92–56296.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 5, 1993.

Decided Jan. 18, 1994.

As Amended May 6, 1994.

Tom Stanley, Los Angeles, California; Henry H. Rossbacher and Tracy W. Young, Rossbacher & Associates, Los Angeles, California, for the defendant-appellant.

Robert L. Brosio, Assistant United States Attorney, Benjamin Jones, Jr., Assistant United States Attorney, Los Angeles, California, for the plaintiff-appellee.

Before: FLETCHER, and D.W. NELSON, Circuit Judges, and WILL *, Senior District Judge.

D.W. NELSON, Circuit Judge:

Defendant-appellant Michael Leslie Blaylock brings a direct appeal from the final decision of the district court under 28 U.S.C. § 1291. Blaylock also appeals the district court's denial of his motion to vacate, set aside or correct his sentence pursuant to 28 U.S.C. § 2255. The two appeals have been consolidated.

In the direct appeal, Blaylock raises an ineffective assistance of counsel claim and challenges the district court's decision to exclude his medical records and to deny him a two-point reduction for acceptance of responsibility. In the Section 2255 petition, he again raises the ineffective assistance of counsel claim. We have jurisdiction to review final decisions of the United States District Court pursuant to 28 U.S.C. § 1291 and Rule 4(b) of the Federal Rules of Appellate Procedure.

We reverse Blaylock's conviction and grant a new trial based on the district court's erroneous and prejudicial decision to exclude Blaylock's medical records. We also reverse the district court's decision to deny Blaylock an evidentiary hearing on the ineffective assistance of counsel claim. We do not reach the issue of whether the district court should have granted Blaylock a two-point reduction for acceptance of responsibility.

## FACTUAL AND PROCEDURAL BACKGROUND

On August 13, 1991 a grand jury indicted Blaylock for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). At the arraignment, on November 25, 1991, counsel was appointed to represent Blaylock. On December 31, 1991, Assistant U.S. Attorney Benjamin Jones, Jr., sent Blaylock's attorney a discovery packet including a cover letter containing the government's settlement offer. Under the proposed settlement, if Blaylock pled guilty, the government would recommend to the district court that "at the time of sentencing [Blaylock] receive a two-point reduction in his base offense level for acceptance of responsibility pursuant to Sentencing Guideline 3E1.1." [letter of Jones to Blaylock's lawyer, dated 12–31–1991]. The letter stated that the settlement offer would expire at 5:00 p.m. on January 9, 1992. On January 10, 1992, one day after the settlement offer had expired, the government filed a timely notice of its intention to seek enhanced penalties if Blaylock were convicted.

Blaylock claims that his attorney did not inform him of the government's offer. Although there is no question that Blaylock was not informed of the offer before it had expired, there is a factual dispute as to whether Blaylock was told about the plea offer prior to trial. The government contends that Blaylock's former attorney informed Blaylock of the government's plea offer on January 14, 1991. In response to the government's contention, Blaylock has submitted affidavits by two attorneys who contacted Blaylock's former attorney to ask him whether or not he had ever communicated the plea offer to Blaylock. Both declarants claim that Blaylock's former attorney

---

* Hon. Hubert L. Will, Senior United States District Judge for the Northern District of Illinois, sitting by designation.

did not even recall the existence of the plea offer.

The government's version of the facts underlying the arrest is also in large part contradicted by Blaylock's factual account. According to both versions of the facts, on April 1, 1991, police officers Reginald Watson and Anthony King, responding to a radio call from dispatch, were patrolling the area surrounding the apartment where Blaylock and his girlfriend, Linda Brown, had been living since November 1990. The officers say that as they were approaching the apartment they saw Linda Brown run out of the apartment with Blaylock in pursuit. Both King and Watson testified that they saw Blaylock holding a gun in his right hand. They further claim that when Blaylock saw them, he ran back into the apartment and that Watson followed him inside, eventually recovering the gun from under the couch and arresting Blaylock.

At trial, Linda Brown provided testimony that contradicted that of the police officers. Brown testified that she did not run out of the apartment. According to Brown, the officers came up to the apartment door, she answered the door and told them she was having a problem with her companion. At that point, according to Brown, the officers asked for Blaylock. After questioning Blaylock, the officers then searched the apartment and found the gun under the couch. According to Brown's testimony, prior to the arrival of the officers, she and Blaylock had been arguing and she had pulled out her gun which Blaylock then took away from her in self defense. Brown testified that although Blaylock at some point had the gun in his hand, he never threatened to use the gun against her.

At trial, Blaylock, who did not testify, raised a justification defense which was directly supported by Linda Brown's testimony. In support of Brown's version of the events, Blaylock tried to introduce medical records showing that he was receiving treatment for a back injury at the time of the arrest. Blaylock contends that the medical records would have undermined the credibility of the officers and cast doubt on their version of the events because the records

show that he could not have run out of the house as the officers had testified. The district court excluded the medical records.

The medical records in question contained a report prepared by Blaylock's doctor after an examination on April 1, 1991, just hours before Blaylock's arrest. The records show that Blaylock had reported weakness and numbness in his left leg as a result of a work-related accident and that, after running some tests, the doctor had prescribed the use of a cane for stability. The medical records also make reference to the fact that Blaylock had gained 15 pounds since his accident because of inactivity. Blaylock reported that he was unable to participate in athletic activities and that he had difficulty performing a range of motions and tasks, including driving, dressing and washing himself, and having sexual intercourse.

On January 29, 1992 a jury convicted Blaylock on the § 922(g)(1) charge. On June 2, 1992 the district court sentenced Blaylock as an "armed career criminal" to a term of imprisonment of 235 months. At sentencing, the district court denied Blaylock's request for a two-point reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1.

## DISCUSSION

### I. THE DISTRICT COURT ABUSED ITS DISCRETION BY EXCLUDING BLAYLOCK'S MEDICAL RECORDS AFTER FINDING THAT THEY WERE RELEVANT

#### A. Standard of Review

■ The district court's evidentiary rulings are reviewed for abuse of discretion. *See United States v. Crespo de Llano*, 838 F.2d 1006, 1018 (9th Cir.1987).

#### B. Analysis

Blaylock claims that the court abused its discretion when it excluded the medical records. According to Blaylock, evidence that he had a back injury requiring use of a cane would have undermined the credibility of the officers' testimony that Blaylock *ran* out of the apartment and would have buttressed the

credibility of Brown's testimony which supported Blaylock's defense.

The district court stated that the records were relevant but were excludable because they lacked foundation. The government concedes on appeal that there was foundation, but argues that the court reasonably could have excluded the documents as irrelevant or, alternatively, under Federal Rule of Evidence 403 because their prejudicial effect significantly exceeded their probative value.

### (1) *Relevance*

Defense counsel tried to introduce the medical records at trial after he and the prosecutor had stipulated to the custody and the keeping of the records, which established the business records exception to hearsay under Fed.R.Evid. 803(6). In ruling that the medical records were inadmissible, the district court stated: "It's relevant. That's not the basis of the ruling that I'm refusing it on. It's relevant, but there is no foundation for it and I'm not just going to allow it." [R.T. 1/29/1992 at 41].

■ Technically, the district court's ruling was incorrect. Before a document can be found relevant, the court must find that it has foundation. *See* Fed.R.Evid. 901(a) and Advisory Committee's note, ("Authentication and Identification represent a special aspect of relevancy.... The need for authentication [is] an inherent logical necessity [of relevance].") (internal citations omitted). Moreover, the prosecutor and the defense attorney had stipulated to the custodial aspect of the medical records and on appeal the government concedes that Blaylock had met the prerequisites for admitting the documents. *United States v. Bellucci*, 995 F.2d 157, 160 (9th Cir.1993) (per curiam) (proponent of document must show authentication, best evidence, and lack of hearsay or an exception to hearsay). The government now contends, however, that the medical records were not relevant.

■ Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable...." Fed.R.Evid. 401; *United States v. Ives*, 609 F.2d 930, 933 (9th Cir.1979), *cert. denied,* 445 U.S. 919, 100 S.Ct. 1283, 63 L.Ed.2d 605 (1980). The medical records were relevant to both the credibility of Linda Brown's and the police officers' testimony and to the plausibility of Blaylock's justification defense. The medical records constituted evidence that Blaylock would have had difficulty running on the day in question. According to Blaylock's medical records, which we have reviewed, Blaylock's doctor had prescribed a cane for balance on the morning of April 1, 1991, the very day that the arrest took place. The records detailed that Blaylock experienced weakness and numbness in his leg, that he could not perform a range of tasks and activities, and that he had to take pain killers regularly. The jury probably would have found that some of this information tended to discredit the officers' testimony, lent credibility to Linda Brown's testimony and strengthened Blaylock's justification defense. Finally, as stated above, the trial court itself found that the medical records were relevant and erroneously held that the documents lacked foundation.

Thus, the first argument set forth by the government, that the district court properly excluded the evidence as irrelevant, is without merit.

### (2) *Federal Rule of Evidence 403*

The government argues, in the alternative, that the district court reasonably could have excluded the medical records under Federal Rule of Evidence 403.

Rule 403 provides in relevant part,

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury ...

■ The first problem with the government's second argument is that the district court did not explicitly exclude the evidence under Rule 403. In *United States v. Layton,* 767 F.2d 549 (9th Cir.1985), the court explained that the reason "[w]e give wide latitude to the trial judge in determining the admissibility of evidence ... [is that the trial judge] is in the best position to assess the

impact and effect of evidence based upon what he perceives from the live proceedings of a trial, while we can review only a cold record." *Id.* at 554 (citations omitted). Here, the district court did not make the relevant assessment, so the rationale does not apply. The *Layton* court, however, also pointed out that "there are other important policies embodied in Rule 403 that mandate appellate deference." *Id.* These policies include, for example, the need for finality. According to the *Layton* court these policies justify "the broad contours of Rule 403." *Id.* Therefore, even in cases such as this one, where the district court did not explicitly exclude the evidence under Rule 403, the appellate court may affirm the district court based on Rule 403. *Id.* at 555.

■ In the present case, however, the district court could not reasonably have found that the probative value of the medical records was outweighed by the danger that the documents would unfairly prejudice, confuse, or mislead the jury. The medical records state in plain language that Blaylock had a back injury, that he needed a cane for balance and that he was unable to participate in a range of physical activities.[1] The district court, not having reviewed the medical records, stated that a doctor's testimony was needed to interpret the medical records but refused to approve the expert witness fees until Blaylock had demonstrated the probative value of the records. Because the medical records were written in plain language, it was not necessary that a doctor explain to the jury the reasonable inferences it could draw from the documents. While Blaylock's treating doctor might have elaborated more fully in his report, a reasonable jury would not have been misled by its contents but instead could have understood that the evidence, while not conclusive, corroborated Linda Brown's testimony and contradicted that of the police officers. Therefore, the prejudicial value of the medical records, if any, was low and did not outweigh their probative value. Consequently, the district court abused its discretion in excluding the medical records.

■ To reverse a conviction based on an erroneous exclusion of a document, "it must be more probable than not that the error affected the verdict." *United States v. McAllister,* 747 F.2d 1273, 1277 (9th Cir. 1984) (citing *United States v. Bailleaux,* 685 F.2d 1105, 1115 (9th Cir.1982); *United States v. Valle–Valdez,* 554 F.2d 911, 916 (9th Cir. 1977)). The outcome of this case turned on the jury's assessment of two competing factual accounts, and the medical records would have significantly buttressed the account the jury ultimately rejected. Furthermore, although Brown's testimony, crucial to Blaylock's justification defense, was corroborated by other evidence such as the fact that she owned the gun and that she produced and identified Blaylock's cane at trial, the medical records would likely have tipped the scales in favor of Brown's account of the events. The jury could have inferred from the medical records alone that on April 1, 1991, Blaylock could not run. We conclude that, had the jury seen the medical records, it more probably than not would have concluded that Brown was a credible witness and thus that the justification defense, which her testimony supported, was valid.

Because we find that the district court's abuse of discretion in excluding the medical records prejudiced Blaylock, we reverse Blaylock's conviction and remand for a new trial.

## II. THE DISTRICT COURT ABUSED ITS DISCRETION IN DENYING BLAYLOCK'S MOTION FOR AN EVIDENTIARY HEARING ON HIS CLAIM OF INEFFECTIVE ASSISTANCE OF COUNSEL

### A. *Standard of Review*

■ We review the district court's decision to deny Blaylock's motion for an evidentiary hearing on his ineffective assistance of counsel claim for abuse of discretion. *United States v. Navarro–Garcia,* 926 F.2d 818, 822 (9th Cir.1991). Ineffective assistance of

---

1. The medical records were written for Blaylock's insurance company and not for other physicians. Therefore, the documents do not con-

tain technical terms that someone without medical knowledge would have had difficulty understanding.

counsel is a mixed question of law and fact that we review *de novo.* *United States v. Layton,* 855 F.2d 1388, 1416 (9th Cir.1988), *cert. denied,* 489 U.S. 1046, 109 S.Ct. 1178, 103 L.Ed.2d 244 (1989).

### B. *The District Court's Duty*

Pursuant to 28 U.S.C. § 2255, a district court must grant a hearing to determine the validity of a petition brought under that section, "[u]nless the motions and the files and records of the case *conclusively show* that the prisoner is entitled to no relief." 28 U.S.C. § 2255 (1988) (emphasis added).

 In deciding whether Blaylock was entitled to an evidentiary hearing on his claim, the district court should have determined whether, accepting the truth of Blaylock's factual allegations, he could have prevailed on an ineffective assistance claim. *See Unites States v. Espinoza,* 866 F.2d 1067, 1069 (9th Cir.1988); *United States v. Burrows,* 872 F.2d 915, 917 (9th Cir.1989); *see also Gov't of Virgin Islands v. Forte,* 865 F.2d 59, 62 (3rd Cir.1989). In this case, the record shows that the district court's denial of an evidentiary hearing under 28 U.S.C. § 2255 constituted an abuse of discretion.

### C. *The Strickland Test*

To prevail on an ineffective assistance of counsel claim, Blaylock must show that: (1) his attorney's performance was unreasonable under prevailing professional standards, *Strickland v. Washington,* 466 U.S. 668, 687–91, 104 S.Ct. 2052, 2064–66, 80 L.Ed.2d 674 (1984); and (2) that there is a "reasonable probability that but for counsel's unprofessional errors, the result would have been different," *id.* at 694, 104 S.Ct. at 2068. *Strickland* defines a reasonable probability as "a probability sufficient to undermine confidence in the outcome." *Id.*

### (1) *Deficient Performance of Counsel*

 Blaylock claims that he received ineffective assistance of counsel when his attorney failed to inform him that the government had made a plea offer. The Ninth Circuit has not addressed the question of whether such conduct constitutes ineffective assis-

tance of counsel. Several other circuits, however, have held that such a failure constitutes unreasonable performance under prevailing professional standards.

In *United States ex rel. Caruso v. Zelinsky,* 689 F.2d 435 (3rd Cir.1982), the defendant alleged that his counsel had failed to communicate to him a plea offer. The *Caruso* court held that "[t]he decision to reject a plea bargain offer ... is a decision for the accused to make ... a failure of counsel to advise his client of a plea bargain ... constitute[s] a gross deviation from accepted professional standards." *Id.* at 438 (citations omitted). In *United States v. Rodriguez,* 929 F.2d 747 (1st Cir.1991), the First Circuit held that "there is authority which suggests that a failure by defense counsel to inform defendant of a plea offer can constitute ineffective assistance of counsel on grounds of incompetence alone, even absent any allegations of conflict of interest." *Id.* at 753 (citations omitted). The Seventh Circuit, in *Johnson v. Duckworth,* 793 F.2d 898 (7th Cir.), *cert. denied,* 479 U.S. 937, 107 S.Ct. 416, 93 L.Ed.2d 367 (1986), held that "in the ordinary case criminal defense attorneys have a duty to inform their clients of plea agreements proffered by the prosecution, and that failure to do so constitutes ineffective assistance of counsel under the sixth and fourteenth amendments." *Id.* at 902. The Fifth Circuit, in *Beckam v. Wainwright,* 639 F.2d 262 (5th Cir.1981), held that although an attorney need not "obtain defendant's consent to every trial decision," where the issue is whether to advise the client to plead or not "the attorney has the duty to advise the defendant of the available options and possible consequences" and failure to do so constitutes ineffective assistance of counsel. *Id.* at 267. Finally, the Sixth Circuit, in *Turner v. Tennessee,* 858 F.2d 1201 (6th Cir.1988), *vacated on other grounds,* 492 U.S. 902, 109 S.Ct. 3208, 106 L.Ed.2d 559 (1989), *reinstated,* 726 F.Supp. 1113 (M.D.Tenn.1989), *aff'd,* 940 F.2d 1000 (6th Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 915, 116 L.Ed.2d 815 (1992), held that an attorney's incompetent advice resulting in the defendant's rejection of a plea offer constituted ineffective assistance of counsel. *Id.* at 1205. If an attorney's incompetent advice regard-

ing a plea bargain falls below reasonable standards of professional conduct, *a fortiori*, failure even to inform defendant of the plea offer does so as well.

██ In addition, under the *Strickland* test, a court deciding whether an attorney's performance fell below reasonable professional standards can look to the ABA standards for guidance. *Strickland*, 466 U.S. at 688, 104 S.Ct. at 2065. The ABA Standards of Criminal Justice provide in relevant part,

> Defense counsel should conclude a plea agreement only with the consent of the defendant, and should ensure that the decision whether to enter a plea of guilty or nolo contendere is ultimately made by the defendant.[2]

The ABA criminal justice standards provide that the *conclusion* of a plea offer should ultimately be decided by the defendant. The use of the term "conclude" implies that the client's consent is needed whether the decision is to accept or reject a plea offer. While *Strickland* explicitly states that ABA standards "are only guides," *Strickland*, 466 U.S. at 688, 104 S.Ct. at 2065, the standards support the conclusion that, accepting Blaylock's allegations as true, defense counsel's conduct fell below reasonable standards.

Based on both the ABA standards and the law of the other circuits, we hold that an attorney's failure to communicate the government's plea offer to his client constitutes unreasonable conduct under prevailing professional standards. Therefore, if Blaylock's alleged factual claims turn out to be true, his former attorney's failure to communicate the plea offer to Blaylock would meet the first part of the *Strickland* test.

## (2) *Prejudice*

To meet the second part of the *Strickland* test, Blaylock must show that there is a reasonable probability that "but for counsel's unprofessional errors, the result would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068. *See also, Lockart v. Fretwell*, ── U.S. ──, ──, 113 S.Ct. 838, 844, 122 L.Ed.2d 180 (1993) (holding that under *Strickland*, petitioner must show that "counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair"). The government argues that even if Blaylock's counsel's alleged conduct was unreasonable, it was not prejudicial.

██ First, we emphasize that although Blaylock has received a fair trial, he is not precluded from showing prejudice. In *United States v. Day*, 969 F.2d 39 (3rd Cir.1992), the Third Circuit "squarely rejected" the argument that "a defendant can suffer no prejudice by standing a fair trial." *Id.* at 44. As the *Day* court stated, "the Sixth Amendment right to effective assistance of counsel guarantees more than the Fifth Amendment right to a fair trial." *Id.*

██ To prevail, however, Blaylock must show that in his case there was a reasonable probability that, but for his attorney's deficient performance, the result would have been different. The government contends that Blaylock insisted on going to trial and that this fact shows that there is no reasonable probability that the outcome would have been different even if his attorney had communicated the plea offer.[3] The record shows, however, that Blaylock's contention— that he would have accepted the plea offer if he had known about it—is not as unlikely as the government suggests, and that, had the

---

**2.** ABA III, Standards of Criminal Justice, 14–3.2

**3.** The government also appears to argue that Blaylock cannot show prejudice because the plea offer did not give Blaylock any benefit that he could not have obtained himself simply by pleading guilty. In other words, the government seems to argue that Blaylock could not be prejudiced by his attorney's alleged failure to communicate the offer because the "plea offer" was meaningless, comparable to an illusory contract. In *United States v. De La Fuente*, 8 F.3d 1333,

1333 (9th Cir.1993), however, this court refused to adopt the government's suggested interpretation of a plea offer which would have rendered the government's offer illusory. The *De La Fuente* court held that even if it were true that the government's plea offer did not give the defendant any benefit that he could not have obtained on his own, it "would decline to acknowledge and reward such conduct in light of the high standard of fair dealing we expect from prosecutors." *Id.* at 1340 (citation omitted).

district court afforded Blaylock an evidentiary hearing, he could have established that he would have accepted the offer. First, the fact that Blaylock, unaware of the government's offer, chose to go to trial does not warrant the inference that there is no reasonable probability that he would have accepted the government's offer had his attorney informed him of the plea offer. Second, during his sentencing hearing Blaylock expressly stated that he would not have gone to trial had he known of the plea offer.[4]

Had Blaylock pled guilty, his sentence would certainly have been much less severe. First of all, the record strongly suggests that the trial court would have been willing to grant Blaylock a two-point reduction for acceptance of responsibility if he had accepted a plea offer prior to trial, but that the court refused to do so after Blaylock had proceeded to trial. Thus, had Blaylock accepted the government's plea offer, he likely would have received at least a two-point reduction for acceptance of responsibility and thus a substantially lower sentence.

Secondly, the record and facts also give rise to a reasonable likelihood that Blaylock was prejudiced in another important respect by his former attorney's alleged failure to inform him of the plea offer. Blaylock contends that if he had accepted the plea offer, the government would not have filed enhanced penalty charges and that, if the government had tried to seek enhanced penalties after the offer had been accepted, it would have been precluded from doing so under the plea agreement. Blaylock's claim is reasonable. The government filed its intent to seek enhanced penalties the day after the expiration date of the settlement offer. The government maintains that the timing of the two events was coincidental and that the plea offer did not include any promises that the government would not seek enhanced penalties. The government's assertions, even if accepted as true, do not defeat Blaylock's argument.

In *United States v. Kamer*, 781 F.2d 1380 (9th Cir.1986), this court, having decided that "probation [was] a sentence within the plea bargain context," *id.* at 1388, held that the government's "failure to *expressly* provide for a probationary term [in its plea offer] must be construed as an internal omission designed to preclude its imposition." *Id.* The *Kamer* court's decision to limit the defendant's sentence to the explicit terms of the plea offer, reflects the principle that a government's plea offer should fully disclose a defendant's sentence under the offer.

Here, it is similarly reasonable to assume that the government's plea offer fully disclosed Blaylock's potential sentence. Absent knowledge in advance of the severity of the sentence he would face were he to accept the government's offer, Blaylock would not have been in a position to decide whether to accept or reject the plea offer.[5] The plea offer, however, did not state that the government would file enhanced penalty charges, or even suggest that, if accepted, the government would reserve the right to seek enhanced penalties. Instead, the government's offer stated:

> The government is prepared to enter into a case settlement agreement with your client containing the following terms: In exchange for your client's plea of guilty to the single count of the Indictment, the government agrees to recommend to the Court at the time of sentencing that your client receive a two-point reduction in his base offense level for acceptance of respon-

---

4. At sentencing, the district court explicitly declined to make a credibility finding with regard to Blaylock's claim that he would have accepted the plea offer if he had known about it. In response to Blaylock's allegations concerning his counsel's failure to inform him of the plea offer, the district court judge stated: "I am not going to get into the situation that I have to decide whether or not you refused that offer or didn't receive that offer. That is not important to me." [R.T. 6/2/1992 at 11].

5. A plea offer should fully disclose the defendant's sentence exposure especially where, as here, the government exercises significant control over the severity of the defendant's sentence. Under 18 U.S.C. § 924(e)(1), if the government introduces evidence that the defendant was convicted on three previous occasions, the sentencing court *must* pronounce an enhanced sentence. Conversely, if the government does not file enhanced penalty charges and does not uncover the prior convictions, the court will not, on its own, impose enhanced penalties under § 924(e)(1).

sibility pursuant to Sentencing Guideline 3E1.1. [E.R. at 23].

 The government's failure to mention its intention to file enhanced penalty charges in its plea offer renders the terms of the offer ambiguous at best. Given the contractual nature of plea offers and given that the government drafted the offer, all ambiguities are to be resolved in favor of Blaylock. *See United States v. Anderson,* 970 F.2d 602, 606 (1992) *amended,* 990 F.2d 1163 (9th Cir. 1993); *United States v. Packwood* 848 F.2d 1009, 1011 (9th Cir.1988); *United States v. Partida–Parra,* 859 F.2d 629, 633 (9th Cir. 1988). The offer, as set forth in the December 31, 1991 letter, reasonably can be interpreted as fully disclosing what kind of sentence the government would seek if Blaylock had accepted the offer. Any ambiguity regarding Blaylock's potential exposure, resulting from the government's failure to indicate in the plea offer whether it would file enhanced penalty charges, even if inadvertent, should be construed against the government. Therefore, the plea offer should be interpreted as implicitly providing that the government would not file enhanced penalty charges.[6]

Accordingly, had Blaylock been informed of and accepted the plea offer, the government would have been precluded from filing the enhanced penalty charges after that time. Therefore, there is a reasonable probability that if Blaylock's allegations are true, he will be able to show that, but for his attorney's failure to inform him of the plea offer, he would have received a *two-point reduction* in his base offense level for acceptance of responsibility and would not have been sentenced as an armed career criminal. The district court therefore erred in denying his ineffective assistance claim without an evidentiary hearing.

## D. *Appropriate Remedy*

 If, after the evidentiary hearing, Blaylock prevails on his ineffective assistance claim, the district court will have to fashion a remedy that is "tailored to the injury suffered and [does] not unnecessarily infringe on competing interests." *United States v. Morrison,* 449 U.S. 361, 364, 101 S.Ct. 665, 668, 66 L.Ed.2d 564 (1981). Since the remedy for counsel's ineffective assistance should put the defendant back in the position he would have been in if the Sixth Amendment violation had not occurred, in certain circumstances granting a new trial may not be the appropriate remedy. Several courts have recognized that where the ineffective assistance occurred *before* trial, as in cases where the harm consisted in defense counsel's failure "to communicate a plea offer to defendant, ... [granting a] subsequent fair trial does not remedy this deprivation." *Caruso,* 689 F.2d at 438 (citation omitted). *See also, Alvernaz v. Ratelle,* 831 F.Supp. 790, 797–99 (S.D.Cal.1993) (Rhoades, J.) (granting specific performance of original plea offer) (citing cases); *Turner,* 858 F.2d at 1208 (requiring reinstatement of the original plea offer unless the prosecution can show nonvindictive reasons for withdrawing the offer).

 Requiring the government to reinstate its original plea offer is constitutionally permissible. *See Mabry v. Johnson,* 467 U.S. 504, 510 n. 11, 104 S.Ct. 2543, 2548 n. 11, 81 L.Ed.2d 437 (1984); *Santobello v. New York,* 404 U.S. 257, 263, 92 S.Ct. 495, 499, 30 L.Ed.2d 427 (1971). *See also, Partida–Parra,* 859 F.2d at 633 (noting that in certain circumstances "it may be appropriate for the court to order 'specific performance' of the [plea] bargain"). Thus, where, as here, the defendant was deprived of the opportunity to accept a plea offer, putting him in the position he was in prior to the Sixth Amendment violation ordinarily will involve reinstating the original offer. The government may of course, in proper cases, seek to demonstrate that intervening circumstances have so

---

**6.** The above analysis does not change even if we accept the government's contention that, sometime between December 31, 1991 and January 9, 1992, Jones discussed with Blaylock's former attorney the possibility that the government would file enhanced penalty charges. Jones' remarks to Blaylock's former attorney, made prior to the expiration of the offer, could have been simply further incentive for Blaylock to accept the plea offer. These remarks do not resolve the ambiguity in the scope of the offer. If Blaylock had known about and accepted the offer set forth in the December 31, 1991 letter and the government, subsequently, had filed enhanced penalty charges, it would have breached the plea agreement.

changed the factual premises of its original offer that, with just cause, it would have modified or withdrawn its offer prior to its expiration date. Here, however, the government concedes that if Blaylock succeeds in his ineffective assistance of counsel claim, requiring it to re-extend the offer of the same plea agreement is appropriate.

Requiring the government to reinstate its original offer would also accommodate the policy articulated by the Supreme Court in *Kimmelman v. Morrison*, 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986), where the Court held that "[t]he Constitution constrains our ability to allocate as we see fit the cost of ineffective assistance. The Sixth Amendment mandates that the State [or the government] bear the risk of constitutionally deficient assistance of counsel." *Id.* at 379, 106 S.Ct. at 2585. Under *Kimmelman*, even if one might perceive that the government's competing interest might be infringed by requiring that the original offer be reinstated, a contrary result would impermissibly shift the risk of ineffective assistance of counsel from the government to Blaylock.[7]

Therefore, if Blaylock prevails on his ineffective assistance of counsel claim, the district court must ensure that the government reinstate its original plea offer as set forth in the December 31, 1991 letter. As our analysis in Part II.C., *supra*, concludes, Blaylock should not be subject to enhanced penalties under this offer.

### CONCLUSION

The district court abused its discretion in excluding Blaylock's medical records. The error was prejudicial. Therefore, we reverse Blaylock's conviction and remand for a new trial. With regard to Blaylock's ineffective assistance of counsel claim we hold that the failure of Blaylock's former attorney to communicate the government's plea offer, if proven, would constitute unreasonable conduct under prevailing professional standards and that there is a reasonable probability that, but for the alleged misconduct, the outcome in this case would have been different.

Therefore, we reverse the district court's denial of Blaylock's request for an evidentiary hearing on his ineffective assistance of counsel claim. Finally, if Blaylock prevails on his ineffective assistance claim, Blaylock should have the choice between going forward with a new trial or accepting the government's original plea offer.

**REVERSED AND REMANDED.**

---

7. We agree with the holding in *Alvernaz* that the possibility of "sandbagging" does not justify reaching a different result. As the *Alvernaz* court explained, "[d]eliberate ineffective assistance of counsel is not only unethical, but usually bad strategy as well." *Alvernaz*, 831 F.Supp. at 799.