**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Jose Guadalupe Bazon LEON,**
**Defendant–Appellant.**

No. 95–50434.
D.C. No. CR 94–1053–DT.

United States Court of Appeals,
Ninth Circuit.

Submitted Dec. 12, 2000 *.

Decided Feb. 12, 2001.

---

* This case was originally calendared for oral argument on April 9, 1997. At that time, the case was continued for supplemental briefing. Upon review of the supplemental briefs, the court finds this case suitable for submission without oral argument. Fed. R.App. P. 34(a)(2).

Before B. FLETCHER and PREGERSON, Circuit Judges, and WEXLER,** District Judge.

## MEMORANDUM ***

Defendant Jose Guadalupe Bazon Leon ("Leon") appeals from a judgment convicting and sentencing him after a jury trial in the United States District Court for the Central District of California before Judge Dickran Tevrizian. Leon was convicted of conspiracy to possess with intent to distribute cocaine in violation of 21 U.S.C. § 846, and possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1). The district court had jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction over this appeal under 28 U.S.C. § 1291. Because we find no merit to Leon's assertions of error, we affirm.

---

** Honorable Leonard D. Wexler, Senior United States District Judge for the Eastern District of New York, sitting by designation.

*** This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir. R. 36–3.

## I. BACKGROUND

On December 23, 1994, a federal grand jury indicted Leon, together with co-defendants Jose Guadalupe Garcia Garcia ("Garcia"), Juan Manuel Aguilar ("Aguilar") and two other individuals, in a two-count indictment charging conspiracy to possess with intent to distribute 50 kilograms of cocaine in violation of 21 U.S.C. § 846, and possession of 10 kilograms of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1). On April 14, 1995, a jury trial commenced before Judge Tevrizian.

The evidence at trial, viewed in a light most favorable to the government, can be summarized as follows: In the middle of 1994, two government informants, Nicholas Vasquez ("informant Vasquez") and Benito Parra–Anzaldo ("informant Parra") met Leon at a barbecue and discussed the possibility of purchasing a large amount of narcotics. At a subsequent barbecue, Leon told the informants that he had sources that could provide drugs, and they arranged a later meeting at Leon's house. At the meeting at Leon's house, Leon and the informants negotiated an amount, 50 kilograms, and a price, approximately $13,000 per kilogram. Leon told the informants that he was getting the cocaine from a person he called "Tocayo," which in English means a person having the same first name as the speaker (in this case, Jose). Leon assured the informants that his "Tocayo" could provide the 50 kilograms.

Subsequently, Leon met with the informants on December 6, 1994 at a Denny's Restaurant in Hawthorne, California. At that meeting, the transaction was arranged to take place the following day, December 7, 1994, at two houses at the intersection of Washington Avenue and 136th Street in the city of Hawthorne, one in which Leon lived (the "Washington Avenue Residence") and one in which Leon's uncle lived (the "136th Street Residence"). Leon told the informants that his source would be at the Washington Avenue Residence during the deal. Leon also told the informants that he was going to his source's house following the Denny's meeting to arrange for delivery of the cocaine.

Immediately after the Denny's meeting, federal agents followed Leon to his house and then to Garcia's house on Cedarvale Avenue in Norwalk (the "Cedarvale Residence"), where Leon stayed for about five to ten minutes, and then returned home. That evening, Leon told informant Vasquez that he had seen his source, and that his source had agreed to provide the cocaine. Leon also told informant Vasquez that he was going to pick up his source the next morning at around 10:00 a.m. at a location near the Washington Avenue Residence, and that the transaction would take place around noon.

At approximately 10:00 a.m. the next morning, December 7, 1994, Leon met Garcia at a liquor store near the Washington Avenue and 136th Street Residences, and Garcia followed Leon back to the Washington Avenue Residence. Shortly after 10:00 a.m., Garcia left the Washington Avenue Residence and drove to a Thrifty gas station in Norwalk, where he made pay phone calls, including what appeared to be pager calls. Garcia drove to his house, the Cedarville Residence, and then back to the Thrifty gas station, where he made more pay phone calls. He remained on the phone until after 11:00 a.m., when he returned to the Cedarvale Residence.

Just before 11:00 a.m. on December 7, informant Vasquez spoke to Leon by telephone. Leon told informant Vasquez that his source had been at Leon's house, that he had tried to page informant Vasquez twice to tell him, and that his source had just left to get the cocaine and would

return later. Leon told informant Vasquez that his source wanted informant Vasquez to come over and prepare to exchange the money for the cocaine.

Shortly after noon on December 7, Garcia drove from the Cedarvale Residence to an Arco gas station on Bellflower and Rosecrans. There, he met a man in a green sweat suit driving a black Mercury Cougar with tinted windows. Sometime after 2:00 p.m. on December 7, Garcia arrived at Leon's Washington Avenue Residence, located approximately 30 minutes from the Cedarvale Residence and the Arco gas station. Garcia stayed at Leon's house until after 3:00 p.m. At approximately 3:00 p.m., Leon spoke to informant Vasquez by phone and told him that the deal was ready to go because his source was already at Leon's house. Shortly after 3:00 p.m., Garcia left Leon's house and drove to a nearby liquor store, where he again met with someone driving the black Cougar. After a brief conversation, Garcia returned to Leon's house.

While Garcia was meeting with the person in the black Cougar, at approximately 3:00 p.m. on December 7, informant Parra arrived at the Washington Avenue Residence and met with Leon. Leon told informant Parra that the cocaine was ready and that informant Parra should come inside the house and meet the owner of the cocaine. Leon also told informant Parra that his source brought only 15 kilograms and would bring the other 35 kilograms if informant Parra was satisfied with the 15 kilograms. Leon said that his source had left the cocaine down at the "corner," at the liquor store, with another man. Leon again asked informant Parra to come inside the house and reassured him that the only person inside was the owner of the cocaine.

Informant Parra went inside the Washington Avenue Residence, where Leon in-troduced him to Garcia as "Tocayo." Leon told Garcia that informant Parra was the nephew of informant Vasquez, who had negotiated the deal with Leon. Garcia told informant Parra that he had the cocaine, but that he had left it at the corner. Garcia then said that he would bring the 15 kilograms now, and the rest later, and that he was leaving to go get the person with whom he had left the cocaine. Shortly thereafter, informant Parra left Leon's house. Due to delays, the deal was eventually postponed until the next day, December 8, 1994.

Shortly after Garcia left Leon's house to drive to the Arco gas station, at approximately 4:30 p.m., Leon spoke to informant Vasquez on the telephone. Leon told informant Vasquez that the owner of the cocaine had just been at his house and left, and that informant Parra had met him.

The next day, December 8, 1994, Leon spoke to informant Vasquez at approximately 2:00 p.m. Leon told informant Vasquez that the cocaine was on its way, and that the source of the cocaine was going to be Leon's "Tocayo," the same person that informant Parra had met the day before.

Shortly after 3:00 p.m. on December 8, Aguilar arrived at the Washington Avenue and 136th Street Residences driving a blue Nissan. A white and green Oldsmobile also arrived at the houses. Aguilar drove the blue Nissan into the garage at the 136th Street Residence. At about that time, Leon spoke to informant Vasquez on the telephone and told him that his source was there with 25 kilograms of cocaine and would have the other 25 kilograms later.

At about 3:30 p.m., informant Parra arrived at Leon's house and met with Leon, who told him that his source only brought 10 kilograms. They were joined by Aguilar, and the three men went into the garage of the 136th Street Residence where

the blue Nissan containing the cocaine was parked. While in the garage, Aguilar and Leon showed informant Parra the cocaine. The three men then discussed how the exchange would take place and agreed that informant Parra would leave to get the money for all 50 kilograms while Aguilar went to get the other 40 kilograms of cocaine. Leon and Aguilar said that the transaction could be completed in that manner because "Tocayo," who was in Leon's house, was there to approve it. Leon and Aguilar also said that they could leave the cocaine in the house while informant Parra went to get the money because "Tocayo" would be responsible for it. Leon told informant Parra that "Tocayo" was the same person informant Parra had been introduced to the day before, i.e., Garcia. Informant Parra then left the area.

Shortly after informant Parra left the area, Aguilar drove the blue Nissan out of the garage and to a nearby gas station, accompanied by the white and green Oldsmobile. Aguilar and three other individuals were arrested at the gas station.

In the meantime, United States Drug Enforcement Administration agents and local police officers secured the area around the Washington Avenue and 136th Street Residences and ordered everyone out of the houses. When Montebello Police Detective Dan Weast entered the yard of the house behind the Washington Avenue and 136th Street Residences, he found Leon and Garcia. Both were detained and then arrested.

Agents searched a blue car that Leon had been driving and found, in a laundry basket in the car, the 10 kilograms of cocaine that Leon and Aguilar showed informant Parra. Earlier, surveillance agents had observed an individual carry a laundry basket from the house to the blue car after informant Parra left the area.

At trial, the government presented testimony of informants Vasquez and Parra regarding their conversations and meetings with Leon, and testimony of surveillance agents concerning Leon's meetings with the informants and other defendants. The government played audiotape recordings of conversations between the informants and Leon during which the fifty kilograms of narcotics was discussed. The government showed videotapes of Leon meeting with the informants and other defendants, and played audiotape recordings of the delivery of 10 kilograms of cocaine by Leon to informant Parra.

During Leon's defense case, but prior to his testimony, the government moved in limine for permission to cross-examine Leon pursuant to Federal Rule of Evidence 609 about his prior conviction for kidnaping. The district court ruled that the prior conviction was admissible for impeachment purposes in light of Leon's proposed duress defense. Leon testified and admitted that he arranged for the sale of 50 kilograms of cocaine to the two informants, but claimed duress due to alleged threats against his family and himself if he did not participate in the narcotics transaction, and that neither Garcia nor Aguilar were involved in the transaction. On direct examination, Leon testified to his prior conviction and incarceration for kidnaping, admitting that he was convicted of kidnaping in 1989 and released from jail in June 1994.

On April 21, 1995, the jury convicted Garcia and Leon on both counts of the indictment and Aguilar on the conspiracy count. Leon was sentenced on September 5, 1995 to 200 months' imprisonment, five years' supervised release, and a $100 special assessment.

On September 11, 1995, Leon filed a timely notice of appeal. Initially, Leon's

assigned counsel filed a brief pursuant to *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), and requested to be relieved. Upon review of the *Anders'* brief, by order entered April 9, 1997, we granted counsel's request to be relieved and continued the appeal. We subsequently appointed new counsel to represent Leon on this appeal and ordered new briefs. In the meantime, we affirmed the convictions and sentences of defendants Garcia and Aguilar by memorandum filed August 18, 1997. We now address the issues raised by Leon on this appeal.

## II. DISCUSSION

On appeal, Leon contends: (1) that the district court erred in granting the government's motion in limine, thereby permitting the government to impeach Leon based on his kidnaping conviction and sentence; and (2) that trial counsel rendered ineffective assistance (a) by eliciting evidence of Leon's kidnaping conviction and incarceration on direct examination, thereby waiving any challenge to the district court's ruling on admissibility, and (b) by requesting that the jury be instructed that Leon suffered a prior "felony" conviction when there was no evidence adduced at trial that Leon's kidnaping conviction was a "felony."

### 1. *In Limine Ruling on Admissibility of Prior Conviction*

■ Leon asserts that the district court erred in granting the government's motion in limine to use his prior conviction and sentence for kidnaping to impeach his credibility. The government argues that Leon is barred from appealing this issue because it has been waived. We agree. By introducing the prior kidnaping conviction on direct examination, Leon waived his right to appeal the district court's in limine ruling. *See United States v.*

*Williams*, 939 F.2d 721, 723–25 (9th Cir. 1991). Even if the prior conviction had been inadmissible, there is no reversible error. *See id.* at 723; *United States v. Bryan*, 534 F.2d 205, 206 (9th Cir.1976) (per curiam). Accordingly, Leon has waived his right to appeal the district court's in limine ruling that this evidence was admissible under Rule 609.

### 2. *Ineffective Assistance of Counsel*

### a. *Eliciting Kidnaping Conviction and Incarceration on Direct Examination*

Leon asserts that trial counsel rendered ineffective assistance by eliciting evidence of Leon's kidnaping conviction and his incarceration on direct examination, thereby waiving rather than preserving the issue for appeal. The government argues that defense counsel did not render ineffective assistance by choosing to elicit this evidence on direct examination. We find no merit to Leon's claim.

■ To establish a claim of ineffective assistance of counsel, a defendant must demonstrate: (1) that counsel's representation fell below an objective standard of reasonableness; and (2) that the defendant suffered prejudice such that, but for counsel's error, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687–96, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *United States v. Blaylock*, 20 F.3d 1458, 1465–66 (9th Cir.1994). Moreover, a reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052. Thus, Leon has the burden of overcoming the presumption that counsel's legal strategy might be considered sound. *See id.*

Upon review of the record, we find that trial counsel did not render ineffective assistance by eliciting evidence of Leon's kidnaping conviction and his incarceration on that conviction on direct examination. As we observed in *Williams*, "[w]hile the choice between preempting the prosecution and preserving the Rule 609 objection for appeal may be perilous, it is no more so than many other decisions defense attorneys must make at trial." *Williams*, 939 F.2d at 725. Trial counsel's decision to elicit this evidence on direct examination was well within the ambit of reasonable trial strategy, a strategy generally taken "to soften the anticipated blow in the eyes of the jury." *Id.* at 723.

In any event, Leon fails to demonstrate prejudice, namely, that the outcome of the proceeding would have been different but for trial counsel's decision to elicit this evidence on direct examination. The evidence clearly supports the jury's finding of Leon's guilt and rejection of his duress defense. The jury reasonably could have found his duress defense incredible given the evidence of Leon's willingness to arrange and participate in the drug transaction, whether the evidence of his kidnaping conviction was elicited by defense counsel on direct examination or by the government on cross-examination. Accordingly, this claim of ineffective assistance of trial counsel is without merit.

b. *Jury Charge Concerning Prior Conviction*

Leon further asserts that trial counsel rendered ineffective assistance by requesting that the jury be instructed that Leon suffered a prior "felony" conviction when there was no evidence adduced at trial that Leon's kidnaping conviction was a "felony." The government argues that defense counsel did not render ineffective assistance by requesting a charge referring to the prior conviction as a "felony." We find no merit to Leon's claim.

The request by Leon's trial counsel did not render her assistance ineffective, particularly since the jury reasonably could have concluded that a kidnaping conviction resulting in several years' incarceration was a felony. Moreover, Leon clearly fails to demonstrate that there is a reasonable probability that the outcome would have been different had the jury not been instructed that the prior kidnaping conviction was a "felony." Accordingly, this claim of ineffective assistance of trial counsel is without merit.

### III. CONCLUSION

For the reasons above, we affirm Leon's judgment of conviction and sentence.

AFFIRMED.