2020 UT App 30

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
JACQUAN DAVID WILSON,
Appellant.

Opinion
No. 20171011-CA
Filed February 27, 2020

Second District Court, Farmington Department
The Honorable Robert J. Dale
No. 151702212

Scott L. Wiggins, Attorney for Appellant

Sean D. Reyes and Marian Decker, Attorneys
for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER
and JILL M. POHLMAN concurred.

HARRIS, Judge:

¶1     In an attempt to prevent his friend (Friend) from showing his pregnant girlfriend (Girlfriend) photographic proof of his infidelity, Jacquan David Wilson stabbed Friend six times with a serrated kitchen knife. A jury convicted Wilson of attempted murder, and Wilson appeals that conviction, claiming that his trial attorney rendered ineffective assistance. We affirm.

## BACKGROUND[1]

¶2     Wilson and Friend got to know each other at work, and the two of them soon became fast friends. They bonded "immediately," and began spending time "talk[ing], text[ing], work[ing] out, hit[ting] the mall, [and] chas[ing] women." At the time, Wilson did not have a permanent residence, but instead spent time "bouncing" between different places; at one point, for about a month, Wilson moved into and lived at Friend's home with Friend and his parents. After living at Friend's house, Wilson moved on to other accommodations, which sometimes included living with Girlfriend. Throughout their friendship, and even while he was living with Girlfriend, Wilson would periodically send Friend photographs of himself having sex with "different women," apparently in an effort to show that "his game was stronger than [Friend's]."

¶3     While Wilson was living at Friend's house, Friend lent Wilson some of his clothes, including a pair of True Religion jeans (the Jeans). Friend had purchased the Jeans upon receiving a promotion at work, and to him, they were not just a pair of pants, but were a symbolic "validation" of his professional success. Much to Friend's displeasure, however, when Wilson moved out of Friend's house, he took Friend's Jeans with him. In the weeks that followed, Friend repeatedly asked Wilson to return the Jeans, but the two were apparently unable to effectuate the transfer.

¶4     A couple of months after he moved out, Wilson returned to Friend's house for a visit, and told Friend that he had gotten Girlfriend pregnant, which he was excited about because he

---

1. "We recite the facts in the light most favorable to the verdict, presenting conflicting evidence only as necessary to understand the issues on appeal." *State v. Salgado*, 2018 UT App 139, ¶ 2 n.1, 427 P.3d 1228.

would now have somewhere more permanent "to lay his head for nine months." Meanwhile, Wilson was also seeing another woman (Girlfriend Two), who Friend knew was waiting for Wilson in the car. Unimpressed with Wilson's behavior, Friend told Wilson he was "irresponsible" and called him "an ass," and then reiterated his request for Wilson to return the Jeans. In response, Wilson deflected, stating simply that he would return the Jeans later.

¶5    Over the course of the next few days, Friend made several attempts to retrieve the Jeans. Because Wilson had blocked Friend on Facebook after their arguments about Wilson's attitude toward women, Friend began communicating through Girlfriend about the return of the Jeans, and at one point Friend even visited Girlfriend's apartment to discuss the matter with her. Wilson even began to suspect some romantic involvement between Friend and Girlfriend, although no evidence of any such relationship is in the record. During the course of his communication with Girlfriend, Friend told her that he knew she was pregnant, and cautioned her that Wilson "may not be the person [Girlfriend] think[s] he is." He also stated that, if he didn't get his Jeans back soon, he would be "[h]otter than hell's flames." Eventually, Girlfriend told Friend that she and Wilson would swing by Friend's house to drop off the Jeans.

¶6    That evening, Wilson came to Friend's front door, knocked, and—when Friend opened the door—handed Friend a plastic bag containing the Jeans. The two began arguing, and Friend became angry with Wilson, and told Wilson that he was going to show Girlfriend—who was waiting in the car—all of the pictures Wilson had sent him of Wilson's sexual exploits. Wilson responded by saying that Friend "wasn't gonna do nothing," and tried to stop Friend from walking to the car. Friend then "kind of like pushed [Wilson] out of the way," not "hard," "just enough to like move him," and proceeded toward the car where Girlfriend was waiting. Friend then began to open the car door, calling Girlfriend's name.

¶7     Suddenly, Friend felt what he thought was a punch in his left shoulder, followed by a number of other quick blows to his back, upper arm, and face. Although Friend did not immediately realize it, Wilson was stabbing him with a serrated kitchen knife whose blade was between six and ten inches long. When all was said and done, Wilson had stabbed Friend six times, with the last blow essentially "fillet[ing] [Friend's] cheek off like [he] was some fish." Girlfriend heard Friend yell, "He stabbed me," as Wilson jumped in the car and commanded Girlfriend to drive away.

¶8     After Wilson and Girlfriend drove off, Friend lay bleeding in the street, calling for help, until his father heard him and drove him to the hospital. Friend had lost a "lot of blood," perhaps as much as "half of his blood volume," and one of his lungs had collapsed, putting him at risk for heart failure. Doctors also discovered that one of the stab wounds had resulted in a broken rib, an injury that requires "a lot of force" and is usually seen in "high velocity injuries" like car accidents. In addition, another of the stab wounds severed the cephalic vein in Friend's right arm, and the stab to Friend's face ran from his right eye to his right earlobe and was deep enough to create an open "flap" of skin and muscle.

¶9     As she drove Wilson away from the scene of the stabbing, Girlfriend was so frightened that she hit a curb as she was making a U-turn, and popped one of the car's tires. Wilson became "upset, like [Girlfriend] had done it on purpose," and Girlfriend was "crying and hyperventilating" as she drove away. She ultimately stopped the car on the side of the freeway because the car could not go any further on the popped tire. Wilson called another friend (Driver) to come pick him up and, later that evening, he "adamant[ly]" told Girlfriend not to "talk[] to the police."

¶10    In part due to Wilson's admonition, Girlfriend waited until the next day to call police and give a statement, and she later admitted that her initial statement was incomplete. For

example, Girlfriend did not tell police that she had seen Wilson with a knife, and that, when Wilson jumped in her car after the stabbing, she recognized the knife he was holding as one of her roommate's serrated kitchen knives. Girlfriend testified at trial that she regretted giving an incomplete statement to police, but that she had been scared to say anything against Wilson at the time because she was pregnant with his child, still in love with him, and afraid to anger him. Although her statement was incomplete, she affirmed at trial that the statement, as far as it went, had been accurate, including her statement that Friend "jumped in the car with me as if [he] was going to hurt me." Indeed, she testified that, when she saw Friend run toward her car and open the door, she was "freaking out" because she did not know what Friend was going to do, and thought he might be "reaching for [her], like he was going to hurt [her]." But in response to the State's questioning, she acknowledged that Friend did not actually threaten her or do anything inconsistent with simply wanting to get in the car to speak to her.

¶11 After he walked away from Girlfriend's car on the night of the stabbing, Wilson called Driver to ask for a ride. Driver had given Wilson rides before, so he didn't think Wilson's call was "terribly out of line," but when he arrived to pick Wilson up, he found Wilson "upset and disheveled," carrying a knife wrapped in a piece of cloth, and demanding a ride from Davis County to Salt Lake County. Driver first drove Wilson to pick up some clothing, and then headed to Wilson's desired destination, stopping on the way to buy bandages and ointment to treat a cut on Wilson's hand. Wilson told Driver about the stabbing, explaining that he had stabbed Friend because Friend had threatened Girlfriend. Eventually, Driver took Wilson to a church parking lot, where Wilson threw the knife in a dumpster, before dropping him off.

¶12 The next day, Wilson texted Girlfriend Two and asked her to come pick him up. Girlfriend Two, who was unaware of the stabbing, took Wilson to her apartment, where the two of them spent time with her kids. Then, Wilson texted Driver, who

picked him up from Girlfriend Two's apartment and unsuccessfully tried to convince Wilson to turn himself in. While Wilson was out, Girlfriend Two saw on Twitter that the local police had issued a felony warrant for Wilson's arrest, and asked Wilson about it when he returned. Wilson explained to Girlfriend Two that, yes, he was wanted by the police, but that Friend had pushed him and that he had acted in self-defense.

¶13 The next day was Thanksgiving, and Wilson spent it with Girlfriend Two, who testified that Wilson was "paranoid" that he would be arrested. Growing increasingly frightened and worried, Girlfriend Two texted "the crime stoppers tip line" to report that Wilson was with her, and police soon arrived at her apartment. Girlfriend Two was so afraid Wilson would see that she had been texting the police that she threw her phone behind the refrigerator. The police began knocking on the door, shining flashlights through windows, and asking to be let in, but for over three hours Wilson refused to open the door and would not let anyone else do so either. Finally, a police hostage negotiator called Wilson's cell phone and, with Girlfriend Two's help, convinced Wilson to let the police in. Police then arrested Wilson and took him to the station for questioning.

¶14 During his interview, Wilson intimated that he personally felt threatened by Friend and that he may have acted in self-defense, although he admitted that Friend had not directly threatened him and that he did not see Friend with a weapon. At no point in his police interview did Wilson mention attempting to protect Girlfriend (rather than himself) from Friend.

¶15 While Wilson awaited trial in jail, he continued to correspond with both Girlfriend and Girlfriend Two. In addition, Wilson discussed the stabbing in a number of recorded jailhouse phone calls with yet another woman (Girlfriend Three). Recordings of certain edited portions of these calls (Audio Clips) were played for the jury at trial, with the text of the conversations sometimes (but not always) displayed on a screen. In the Audio Clips, Wilson can be heard acknowledging to

Girlfriend Three that the police were "recording these conversations" and that the conversations were "going to be used against [him]." And yet Wilson engaged in lengthy discussions in which he described to Girlfriend Three his version of the events that led to the stabbing, and specifically made the following statements:

- "I gotta think of a good reason as to why my life was in danger" "because, obviously, my story, me telling the truth doesn't sound believable."

- "I eliminate" people who "f*** with me" "real quick," and that "I am not [Friend]" because "I don't call the cops" and instead "handle shit on my own."

- "I really put n*****s down, y'all. I really—I really have the capacity to kill somebody, you understand? And think nothing of it."

- "[I]f [Friend] tries something, I'm going to put this n****r in the hospital, I don't care."

- In a possible reference to Friend attempting to tell Girlfriend about his infidelities: "So I'm already, in my mind, like, okay, well, don't think you about to, like, f*** me up because I ain't going to let that happen."

- In reference to going to Friend's house to drop off the Jeans: "I'm hoping that I can just drop off the shit because I know—I already know how I am. If he touch me, I'm going to try to kill him."

- "If somebody stabbed me, I'd kill them. That's it. Serious. All [Friend] did was push me and I

stabbed him up. . . . All he did was push me and hit me and he got stabbed the f*** up."

- "I do feel as though I used a little too much force."

- "[Friend] got handled, dog, straight East Coast style. He thought I was one of these Utah motherf***ers that I was going to tell the cops, or get bitch slapped or some shit like that, and he got stabbed the f*** up. What do—what do you want me to say?"

At no point in any of the Audio Clips did Wilson state or imply that he acted in order to protect Girlfriend or their unborn child from Friend's perceived aggression. In between these statements, Wilson can be heard on the Audio Clips using racial slurs and repeated foul language, and using demeaning and derogatory language about and toward Girlfriend Three, who was on the other end of the telephone.

¶16   Soon after arresting him, the State charged Wilson with attempted murder, a first-degree felony, and obstruction of justice, a second-degree felony.[2] Eventually, the case proceeded to a jury trial, where Wilson's attorney advanced a defense-of-others theory: that is, he framed the stabbing of Friend as an act Wilson took to protect Girlfriend and their unborn baby from Friend's threatening behavior, and argued that Wilson had never intended to murder Friend. In his opening statement, counsel addressed the Audio Clips that he knew would soon be presented to the jury, and expressed his "hope" that the jury would understand that these conversations were merely Wilson's attempt "to puff himself up" because he was in jail, and stated that they depict him saying "things that are absolutely not

---

2. The State asserted that Wilson had obstructed justice by throwing the knife in the church dumpster.

true in order to make himself seem tougher and better and bigger than what he really is."

¶17 After opening statements, defense counsel learned that the State was not, after all, going to call Girlfriend Three as a witness at trial. Upon receiving this information, counsel objected to the State's use of the Audio Clips, reasoning that, without Girlfriend Three's testimony to put the conversations in context, the Audio Clips would be unfairly prejudicial to Wilson because of how poorly they reflected on his character. Counsel lodged no other objection to the Audio Clips. The trial court did not immediately make a ruling on counsel's objection, and in the meantime, Wilson's counsel located Girlfriend Three and secured her commitment to testify for the defense. At that point, knowing that Girlfriend Three would in fact testify, counsel withdrew his objection to the Audio Clips.

¶18 In its case-in-chief, the State called twelve witnesses, including Friend, Girlfriend, Girlfriend Two, Friend's father, Driver, and various law enforcement and medical witnesses. The Defense called just one witness, Girlfriend Three, who testified to her impressions of the Audio Clips. Wilson did not testify.

¶19 During the course of the trial, many of the witnesses testified using raw, coarse, and profane language, including use of the f-word and several variants of the n-word. Friend, for example, explained to the jury the difference between the use of the terms "n****r" and "n***a," and testified that those words had particular meaning to himself and Wilson, who are both black men. Additionally, Friend testified that, during the verbal altercation leading up to the stabbing, both he and Wilson used the same type of coarse and profane language that the jury heard Wilson use in the Audio Clips.

¶20 At defense counsel's request, the trial court instructed the jury on both perfect and imperfect defense of others, and gave the jury a verdict form with four options on the attempted murder count: (1) not guilty; (2) guilty of attempted murder; (3)

guilty of aggravated assault, a lesser-included offense; and (4) guilty of attempted manslaughter, a verdict that would be appropriate if the jury agreed that Wilson had acted in imperfect self-defense. Counsel ultimately decided not to request a separate instruction on the lesser-included offense of attempted manslaughter, a verdict that might have been appropriate had Wilson argued, for instance, that he had acted with the outrage of a jealous lover. Counsel ultimately chose to mount a defense-of-others defense, rather than a jealous-lover defense, and reasoned (as the verdict form showed) that the jury would already have the option of convicting Wilson of attempted manslaughter, if it wished, through the imperfect defense-of-others part of counsel's defense.

¶21　After hearing the evidence and deliberating, the jury found Wilson guilty of both attempted murder (with a dangerous-weapon enhancement) and obstruction of justice, and the trial court sentenced Wilson to a prison term of four-years-to-life for attempted murder, and a consecutive term of one-to-fifteen years for obstruction of justice.

ISSUE AND STANDARD OF REVIEW

¶22　Wilson now appeals his attempted murder conviction,[3] arguing that his trial attorney provided constitutionally ineffective assistance.[4] "When a claim of ineffective assistance of

---

3. At oral argument before this court, Wilson clarified that he is not appealing his conviction for obstruction of justice.

4. During oral argument, Wilson also requested that we reconsider our denial of a motion he had filed pursuant to rule 23B of the Utah Rules of Appellate Procedure. But this request was made for the first time at oral argument, without previous notice to the State; that is, Wilson did not file a written motion seeking reconsideration of our previous decision, and did not

(continued…)

counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *Layton City v. Carr*, 2014 UT App 227, ¶ 6, 336 P.3d 587 (quotation simplified).

ANALYSIS

¶23 Wilson argues that his trial counsel provided ineffective assistance in three respects: first, by choosing to

---

(…continued)

make any such request in his appellate briefs. Utah appellate courts "do not address issues raised for the first time during oral argument." *See Porenta v. Porenta*, 2017 UT 78, ¶ 33, 416 P.3d 487. Accordingly, we decline to consider Wilson's request to reconsider our denial of his rule 23B motion.

Moreover, even if we were inclined to revisit our denial of Wilson's rule 23B motion, we would not reverse our decision because we remain convinced of its correctness. We denied Wilson's rule 23B motion because the evidence he sought to add to the record—a transcript of his interview with police—was already contained in the record. Wilson has not demonstrated that this conclusion was erroneous. We also note that, in his rule 23B motion, Wilson intimated that his *Miranda* rights may have been violated in that interview; our denial of his rule 23B motion was not a commentary on the merits of his potential *Miranda* claim. However, perhaps under the impression that our denial of his rule 23B motion was an indication that we did not think much of his *Miranda* claim, Wilson did not raise a *Miranda* argument in his appellate brief, even though he still could have. A denial of a rule 23B motion is not necessarily—and was not here—a rejection of the legal argument underlying the motion. Given that Wilson makes no *Miranda* argument in his brief, we may not consider that argument under the guise of reconsidering the denial of his rule 23B motion.

withdraw his objection (and not make another) to the admission of the Audio Clips; second, by failing to deliver on a "promise" made in opening statement that he would demonstrate that the statements Wilson made in the Audio Clips were untrue; and third, by failing to request a separate jury instruction on attempted manslaughter as a lesser-included offense.

¶24 In order to demonstrate that his trial attorney rendered constitutionally ineffective assistance, Wilson must make a two-part showing: (1) that counsel's "performance was deficient in that it fell below an objective standard of reasonableness," and (2) that counsel's deficient performance was "prejudicial." *See State v. Miller*, 2012 UT App 172, ¶ 9, 281 P.3d 282 (quotation simplified). Wilson must satisfy both parts of the test in order to show ineffective assistance. *See Archuleta v. Galetka*, 2011 UT 73, ¶ 41, 267 P.3d 232. Accordingly, we "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland v. Washington*, 466 U.S. 668, 697 (1984).

¶25 Both parts of the test—deficient performance and prejudice—require substantial showings. An attorney's performance is deficient if it falls "below an objective standard of reasonable professional judgment," *State v. Sessions*, 2014 UT 44, ¶ 17, 342 P.3d 738, and in order to make the necessary showing, Wilson must demonstrate that his trial counsel acted in manner that was "objectively unreasonable," s*ee Lee v. United States*, 137 S. Ct. 1958, 1962 (2017); *see also Sessions*, 2014 UT 44, ¶¶ 21–29, (discussing whether counsel's actions were "objectively unreasonable"). This is a difficult showing to make. Because "[t]here are countless ways to provide effective assistance in any given case," and "[e]ven the best criminal defense attorneys would not defend a particular client in the same way," "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

¶26    In order to establish prejudice, Wilson must demonstrate that "there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." *See Miller*, 2012 UT App 172, ¶ 9 (quotation simplified). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In weighing whether the result of the proceeding may have been different absent counsel's deficient performance, a court must "consider the totality of the evidence before the judge or jury and then ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." *State v. Garcia*, 2017 UT 53, ¶ 28, 424 P.3d 171 (quotation simplified). That is, to establish prejudice, Wilson must show that the overall outcome of the trial—the verdict itself—is reasonably likely to have been different if his trial counsel had not performed deficiently.

A

¶27    Wilson's first complaint about his trial counsel's performance centers around counsel's failure to lodge and maintain an objection to the admission of the Audio Clips. Specifically, Wilson asserts that his attorney should have moved for exclusion of the Audio Clips pursuant to rule 403 of the Utah Rules of Evidence. But on this point, Wilson cannot establish that his attorney rendered ineffective assistance.

¶28    To show that counsel's failure to object constituted deficient performance, Wilson must establish that counsel's conduct fell outside of the "wide range of reasonable professional assistance." *Strickland v. Washington*, 466 U.S. 668, 689 (1984). It is well-settled that failure to raise an objection that would have almost certainly been overruled does not constitute ineffective assistance. *State v. Kelley*, 2000 UT 41, ¶ 26, 1 P.3d 546 ("Failure to raise futile objections does not constitute ineffective assistance of counsel."). Had counsel lodged a timely rule 403 objection, the trial court would have been required to balance the probative value of the Audio Clips against their potential for

unfair prejudice, with the evidence being excluded only "if its probative value is substantially outweighed by a danger" of "unfair prejudice." *See* Utah R. Evid. 403. And we think that balance would have come out in favor of admission of at least a substantial portion of the Audio Clips.

¶29   Wilson's chief argument is that his attorney should have objected to the admission of the Audio Clips in their entirety. But at least certain portions of the Audio Clips—for instance, the excerpts set forth above in our bullet-point list, *supra* ¶ 15—have significant probative value, because they shed light on Wilson's state of mind at the time of the stabbing, and tend to demonstrate that Wilson acted out of neither self-defense nor a concern for Girlfriend's well-being. Indeed, even Wilson admits that portions of the Audio Clips "were in direct conflict with [Wilson's] primary defense theory that the stabbing occurred in the defense of others," and that they "directly undermined [Wilson's] primary defense theory at trial." There is no question, then, that portions of the Audio Clips were highly probative.

¶30   Wilson argues, however, that, because these portions of the Audio Clips were so harmful to his case, he must have suffered prejudice as a result of their admission. To the extent that "prejudice" is defined simply as making a difference to the outcome, Wilson is undoubtedly correct, because all probative evidence, to some degree, tends to affect the outcome. That's why it's considered probative. But if that is the only manner in which a piece of evidence can be considered "prejudicial," its prejudice is by definition not unfair. *See State v. Maurer*, 770 P.2d 981, 984 (Utah 1989) (stating that "all effective evidence is prejudicial in the sense of being damaging to the party against whom it is offered," and that "prejudice which calls for exclusion is given a more specialized meaning" (quotations simplified)); *see also United States v. Adames*, 56 F.3d 737, 742 (7th Cir. 1995) (stating that "all probative evidence is prejudicial to the party against whom it is introduced," but noting that such prejudice is not necessarily "unfair"); *State v. Fenley*, 646 P.2d 441, 445 (Idaho Ct. App. 1982) ("Probative evidence is always prejudicial to

someone. Unless the prejudice is unfair, it affords no basis to exclude the evidence."). Thus, the core statements contained in the Audio Clips were not *unfairly* prejudicial merely because they helped the State's case and hindered Wilson's.

¶31    Wilson also points out that some of the statements contained in the Audio Clips—including some of the core probative statements—demonstrate that he used foul language and racial slurs and had a poor attitude toward women, and therefore show him in a bad light, and he argues that jurors, after hearing him speak in these terms, might have determined to convict him simply because they considered him a bad person. Unlike the type of "prejudice" referred to in the preceding paragraph, this sort of prejudice is precisely the kind of thing with which rule 403 is properly concerned. As our supreme court stated in *Maurer*, prejudice starts to become "unfair" when it creates a "tendency to suggest decision on an improper basis, commonly but not necessarily an emotional one, such as bias, sympathy, hatred, contempt, retribution, or horror." *See Maurer*, 770 P.2d at 984 (quotation simplified).[5] But

--------

5. Wilson relies heavily on our supreme court's holding in *State v. Maurer*, 770 P.2d 981 (Utah 1989). In that case, the trial court allowed the State to introduce a letter the defendant had written to the murder victim's father, in which the defendant taunted the father with statements like, "[y]ou might have prevented [the murder]. I hope you feel guilt over it," and "[i]t was a great feeling to watch her die." *Id.* at 982. On appeal, our supreme court concluded that admission of the letter was erroneous because the letter's probative value was substantially outweighed by the danger of unfair prejudice. *Id.* at 984. But that case presents a situation quite different from the facts at hand: the letter at issue in *Maurer* was both less probative and more prejudicial than Wilson's statements contained in the Audio Clips. Unlike the Audio Clips, the *Maurer* letter did not speak directly to the defendant's state of mind at the time of the crime. And the *Maurer* letter was much more incendiary and

(continued…)

in this case, jurors had already heard other witnesses, including Friend, testify using similar language, and were thereby already aware of the ways in which some of the people involved in this case often conversed with one another. Moreover, as we have recently recognized, foul language has "lost much of [its] shock value in contemporary culture." *See State v. Johnson*, 2016 UT App 223, ¶ 38, 387 P.3d 1048 (quotation simplified). We simply do not think that the sort of language Wilson used in the Audio Clips would have caused the jury to convict him for improper emotional reasons. Stated another way, the probative value of the most probative part of the Audio Clips, *see supra* ¶ 15, was not substantially outweighed by the danger of unfair prejudice, and any objection that Wilson's attorney might have lodged to exclude the Audio Clips in their entirety would have certainly been overruled. At minimum, the court would have admitted the relevant and most probative portions of the Audio Clips. Accordingly, counsel did not perform deficiently by failing to lodge a futile blanket objection. *See Kelley*, 2000 UT 41, ¶ 26.

¶32    And a more limited objection, even had it been granted, would not have made a difference to the outcome of the trial. Instead of lodging a blanket objection to the admission of any portion of the jailhouse phone calls, Wilson's attorney could have asked the court to limit admission to only a few statements, the ones with the highest probative value, including the ones quoted above. While such a limited objection might well have been sustained, it is not reasonably likely that elimination of

---

(…continued)

potentially prejudicial than the Audio Clips, and much more likely to have led the jury to convict for improper reasons. *See State v. Alzaga*, 2015 UT App 133, ¶ 51, 352 P.3d 107 (distinguishing *Maurer* for similar reasons, and stating that "the core concern with the letter in *Maurer* was not so much the letter's language but what it revealed about the defendant's character: he wrote it to inflict additional emotional pain upon the victim's father, literally to add insult to injury").

only the less-probative statements would have made a difference to the outcome of the case, and we therefore conclude that Wilson cannot have been prejudiced by his attorney's failure to lodge such an objection. The State's evidence against Wilson was strong. Wilson did not deny stabbing Friend, and both Friend and Girlfriend testified that Friend did not threaten Girlfriend. Even Wilson himself, when interviewed by the police, made no statements indicating that he stabbed Friend to protect Girlfriend. And under our present hypothetical, the jury would also have heard those portions of the Audio Clips in which Wilson admits that his story is not credible, that he was prepared to "kill" Friend if he so much as "touch[ed]" him, and that he used "too much force" on Friend, who merely pushed him. In sum, we do not view it as reasonably likely that a paring-down of the Audio Clips would have resulted in a different outcome.

¶33 Accordingly, Wilson has not carried his burden of demonstrating that his attorney rendered constitutionally ineffective assistance by failing to raise a rule 403 objection to all or part of the Audio Clips. Any such objection aimed at the Audio Clips in their entirety would have been denied, and a more limited objection, even if granted, would not have changed the outcome.

B

¶34 Next, Wilson argues that his attorney provided ineffective assistance when he "essentially promised" the jury, during opening statements, that he would demonstrate that the statements made in the Audio Clips were "absolutely not true," and then failed to deliver on that promise. This claim is infirm, because Wilson misinterprets trial counsel's statements, and fails to demonstrate that counsel performed deficiently.

¶35 When the trial began, Wilson's attorney was operating on the assumption that the Audio Clips would be introduced to the jury during the State's case-in-chief, and he decided to address

the issue head-on during his opening statement. In that statement, counsel expressed his hope that the jury would come to understand the Audio Clips as a reflection of jailhouse bravado, which he believed Wilson had adopted as a way to "puff himself up." In addition, counsel described Wilson as saying things in the Audio Clips "that are absolutely not true in order to make himself seem tougher and better and bigger than what he really is." On appeal, Wilson construes these statements as a "promise" on the part of counsel to introduce evidence debunking Wilson's jailhouse statements, and concludes that counsel performed deficiently by failing to do so.

¶36 We disagree. As an initial matter, Wilson overreads counsel's opening statement. By attempting to explain away the Audio Clips, counsel was not making any sort of binding "promise" to the jury that he would present any particular evidence. Rather, we think counsel's statement is best understood as an attempt to convey to the jury his belief that the man they were going to hear on the Audio Clips was not a fair or complete depiction of who Wilson really was, and an attempt to explain away, as best he could, some relatively damning statements made by Wilson himself.

¶37 Moreover, and more substantively, we think counsel's actions during opening statement fall squarely within the bounds of "sound trial strategy," as *Strickland* allows, and Wilson has not carried his burden of demonstrating that counsel's actions were unreasonable. *See Strickland v. Washington*, 466 U.S. 668, 689 (1984) (quotation simplified). A reasonable attorney could—and here, did—anticipate that the Audio Clips would reflect poorly on Wilson, and therefore could choose to characterize them as mere puffery rather than as realistic reflections of the situation.

¶38 Thus, Wilson has failed to demonstrate that his attorney performed deficiently in the manner in which he discussed the Audio Clips in his opening statement, and Wilson's second claim for ineffective assistance of counsel fails on this basis.

C

¶39 Finally, Wilson argues that trial counsel rendered ineffective assistance by failing to request a separate and additional instruction on attempted manslaughter as a lesser-included offense. Under the circumstances, we disagree.

¶40 In this case, counsel decided to center Wilson's defense strategy around a defense-of-others theory: that Wilson had stabbed Friend in an effort to protect Girlfriend and their unborn child from Friend's perceived aggression, and that Wilson never intended to murder Friend. Counsel had other options—he could have, for instance, also advanced a jealous-lover theory in which Wilson stabbed Friend because he thought there was something romantic going on between Friend and Girlfriend, or he could have focused more on a self-defense theory given that Friend pushed Wilson in the moments before the stabbing.

¶41 The choice of which primary defense theory to advance is a strategic decision that will not often be second-guessed on appeal. *See State v. Pascual*, 804 P.2d 553, 556 (Utah Ct. App. 1991) (stating that "any election between inconsistent defenses was a legitimate exercise of trial strategy rather than ineffective assistance of counsel"); *State v. Wight*, 765 P.2d 12, 15 (Utah Ct. App. 1988) (stating that we "will not second-guess a trial attorney's legitimate use of judgment as to trial tactics or strategy"). In this case, Wilson's attorney had to choose which defenses (among several less-than-optimal options) to advance, and he elected to advance primarily a defense-of-others theory. While the evidence in support of this theory was by no means overwhelming, it was arguably better supported than a jealous-lover theory or a self-defense theory. Indeed, the evidence showed that Friend walked quickly toward the car in which Girlfriend was waiting, and Girlfriend testified that she was "freaking out" because she did not know what Friend was going to do. The evidence supporting a "jealous lover" defense was nothing more than speculation, and—as Wilson himself recognized in the Audio Clips—the "self-defense" theory was

weak because Friend's only act of physical aggression was a light push. On the facts of this case, we cannot conclude that counsel's choice of defense was unreasonable.

¶42    And given counsel's choice of defenses, his actions with regard to jury instructions and the verdict form were entirely appropriate. His chosen theory—defense of others—allowed him to request and obtain jury instructions on both perfect and imperfect self-defense, and allowed him to obtain an option on the verdict form for both attempted manslaughter as well as aggravated assault.[6] Wilson has not demonstrated that these choices were unreasonable, and therefore has fallen short of showing that his trial counsel performed deficiently. His third claim for ineffective assistance of counsel fails on this basis.

CONCLUSION

¶43    Wilson's trial counsel did not provide ineffective assistance in any of the three respects Wilson argues on appeal. Accordingly, we affirm.

————————

6. On appeal, Wilson is critical of trial counsel for not affording the jury a "third option—the choice of conviction of a lesser offense rather than conviction of the greater or acquittal." But Wilson overlooks that the verdict form that counsel obtained actually had *four* options: guilty, not guilty, guilty of aggravated assault, and guilty of attempted manslaughter.